**Ricardo ARREDONDO, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

Nos. 96–2126, 96–2583.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1998.

Decided May 28, 1999.

)

Ricardo Arredondo, Federal Correctional Institute, Milan, MI, Kevin M. Schad (argued and briefed), Schad, Buda & Cook, Cincinnati, Ohio, for Petitioner–Appellant.

Michael Hluchaniuk (argued and briefed), Office of the U.S. Attorney, Bay City, MI, David J. Debold, Office of the U.S. Attorney, Detroit, MI, for Respondent–Appellee.

Before: BOGGS and MOORE, Circuit Judges; DOWD,* District Judge.

## OPINION

MOORE, Circuit Judge.

Ricardo Arredondo was convicted for his role in a conspiracy to distribute heroin and cocaine in Saginaw, Michigan. This court affirmed his conviction on appeal, and he filed a petition to vacate his sentence. He argued, *pro se,* that his counsel was ineffective for failing to tell him about a plea offer on the eve of trial and for failing to object to the government's assertion that he was responsible for more than one kilogram of heroin. When the district court denied the petition, Arredondo requested reconsideration and appealed to this court. After the motion for reconsideration was denied, he also appealed that ruling. Both appeals are now before us.

We hold that the district court erred in refusing to hold an evidentiary hearing to address Arredondo's claim of ineffective assistance based on his lawyer's failure to challenge the conclusory attribution to him of more than one kilogram of heroin. We also hold that the district court erred in denying Arredondo's motion for reconsideration with respect to the alleged failure to communicate a plea offer. We therefore **VACATE** the district court's denial of the petition to vacate, **REVERSE** its denial of the motion for reconsideration, and **REMAND** this case for further proceedings.

* The Honorable David D. Dowd, United States District Judge for the Northern District of

## I. BACKGROUND

Arredondo was charged with being part of a conspiracy to distribute heroin and cocaine, in violation of 21 U.S.C. §§ 841(a) and 846, and with two specific acts of distributing heroin, in violation of 21 U.S.C. § 841(a). The conspiracy centered around a house from which Arredondo's supplier, Anacleto Sepulveda, distributed the drugs. From 1987 to 1989, Arredondo was one of several drug dealers who bought from Sepulveda on a regular basis and re-sold small, personal-use quantities to his customers.

The government asserts that a "final status conference/plea cut-off" meeting was held on August 27, 1990, and was the last opportunity for any defendant to enter into a negotiated plea. Arredondo did not plead guilty. At his trial, which he shared with several other defendants, he was represented by Thomas Plachta and was convicted on all three counts.

In the Presentence Report ("PSR"), the probation officer summarized the total amount of drugs involved in the entire conspiracy and then stated:

18. Information indicates that beginning in 1987 RICARDO ARREDONDO began purchasing heroin from Anacleto Sepulveda at the rate of several times a week.

19. Based on the evidence provided, it is felt that RICARDO ARREDONDO would be responsible for between 1 and 3 kilograms of heroin.

Joint Appendix ("J.A.") at 152(PSR). The PSR also stated:

20. MR. ARREDONDO, upon the advise [sic] of his attorney, provided no information regarding his involvement in this offense. The defendant's attorney advised the Probation Office would be provided a written statement as to MR.

Ohio, sitting by designation.

ARREDONDO's involvement no later than October 26, 1990. As of the writing of this report, this information has not been received. [The PSR is dated November 20, 1990.] J.A. at 152(PSR). Defense counsel filed no objections to the PSR. The district court adopted the findings and conclusions in the PSR, also without any substantive objection by defense counsel. Sent. Hr'g Tr. at 3–4. Under the Sentencing Guidelines, Arredondo's total offense level was 32, and his criminal history category was III. *See* U.S. Sentencing Guidelines ("U.S.S.G.") § 2D1.1(c) (1990)[1]; J.A. at 153(PSR). Under the Guidelines, this would have led to a sentence of 151 to 188 months (12.6 to 15.7 years). *See* U.S.S.G. § 5A (Sentencing Table). However, because Arredondo had one prior felony drug conviction and was responsible for more than one kilogram of heroin, he was sentenced to twenty years in prison, the statutory minimum.[2] *See* 21 U.S.C. § 841(b)(1)(A)(i).

Plachta continued to represent Arredondo on appeal and did not challenge the district court's attribution of more than one kilogram of heroin to his client. This court affirmed the conviction. *United States v. Robelin,* 983 F.2d 1070 (Table), 1993 WL 6828 (6th Cir.), *cert. denied,* 507 U.S. 1009, 1011, 1039, 113 S.Ct. 1658, 1662, 1869, 123 L.Ed.2d 277, 280, 489; 508 U.S. 953, 510 U.S. 831, 834, 113 S.Ct. 2449, 114 S.Ct. 101, 109, 124 L.Ed.2d 666, 126 L.Ed.2d 68, 75 (1993).

Arredondo later obtained an affidavit from Maria Teneyuque, whose sister, Mary Jane Dietrich, was a witness at the trial. Teneyuque stated that Dietrich told her about an incident that occurred just before the start of the trial, on September 10, 1990. Teneyuque says that Dietrich overheard the prosecutor tell Plachta that he would let Arredondo plead guilty with a ten-year maximum sentence. Arredondo claims that on the same day he saw Plachta talking to the prosecutor and "terminate the conversation ... by making a shaking gesture with his head indicating a negative 'no.'" J.A. at 33 (Arredondo Aff. 3/12/96).

Arredondo attached Teneyuque's affidavit to his *pro se* motion pursuant to 28 U.S.C. § 2255. The motion argued that Plachta was ineffective for failing to tell Arredondo about the alleged plea offer and for failing to object to the drug amounts asserted in the PSR and adopted by the district court. Arredondo also challenged, on the merits, the amount of heroin attributed to him. In its May 31, 1996, response, the government submitted affidavits from Plachta and from the prosecuting attorney, Michael Hluchaniuk, both of whom denied that the September 10 plea offer had occurred. However, Hluchaniuk's affidavit also mentioned that some time before the August 27 plea cut-off date the government had extended a plea offer, which was rejected by defense counsel. J.A. at 59 (Hluchaniuk Aff.).

The district court denied Arredondo's petition on June 27, 1996, adding, "Any appeal from this order would be frivolous and not in good faith.... Thus, no certificate of probable cause [to appeal] will issue." J.A. at 69 (Dist.Ct.Op.). Arredondo filed a "Motion for Reconsideration," which we construe as a Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59(e). To his motion, he attached an affidavit in which he stated that his lawyer had never informed him of

---

1. We refer throughout this opinion to the statutory and Guidelines sentencing provisions that were in effect in April 1991, when Arredondo was sentenced. However, the relevant provisions have not changed in any way that would affect this case.

2. Assuming that Arredondo was instead responsible for less than one kilogram, but more than 700 grams, of heroin (see part II.B), his offense level would have been 30, leading to a sentencing range of 121–151 months (10.1 years to 12.6 years). His prior felony drug conviction would have required a ten-year minimum sentence under 21 U.S.C. § 841(b)(1)(B)(i).

*any* plea offer from the government, and that the prosecutor's affidavit was the first he had heard of the earlier offer. He also reiterated that he had continually pestered his attorney to obtain a plea bargain, and he elaborated on his September 10, 1990, observations, surmising that perhaps the attorneys were discussing the earlier plea offer.[3] The district court denied the motion for reconsideration, and Arredondo appealed. In the meantime, he had also appealed the denial of his petition. Continuing *pro se* as he negotiated a procedural thicket, *see Arredondo v. United States,* 120 F.3d 639, 639–40 (6th Cir.1997) (per curiam order), Arredondo eventually obtained a new attorney to represent him in these appeals.

## II. ANALYSIS

### A. PLEA OFFERS

■ To obtain relief under § 2255 on the grounds of ineffective assistance of counsel, Arredondo must establish (1) that his lawyer's performance was deficient as compared to an objective standard of reasonable performance and (2) that there is a reasonable probability that the lawyer's errors prejudiced the outcome of the proceedings against him. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome"; it is a less demanding standard than "more likely than not." *Id.* at 693–94, 104 S.Ct. 2052. We review ineffective-assistance claims de novo. *See Watkins v. Kassulke,* 90 F.3d 138, 143 (6th Cir.1996).

The government concedes that failure to inform a client of a plea offer is probably a serious enough error to satisfy the performance prong of *Strickland. See United*

*States v. Blaylock,* 20 F.3d 1458, 1465–66 (9th Cir.1994) (collecting cases from several circuits); *Turner v. Tennessee,* 858 F.2d 1201, 1205 (6th Cir.1988) (holding that incompetent advice resulting in defendant's rejection of plea offer is deficient performance under *Strickland* ), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989). Its defense to Arredondo's petition is that the alleged plea offer never happened. Thus, the issue on appeal is primarily whether the district court was obliged to conduct an evidentiary hearing on whether a plea offer was extended and not conveyed to Arredondo.

■ We review the district court's refusal to conduct an evidentiary hearing for abuse of discretion. *See Blanton v. United States,* 94 F.3d 227, 235 (6th Cir.1996). An evidentiary hearing is required unless "the record conclusively shows that the petitioner is entitled to no relief." *Id.* Thus, no hearing is required if the petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States,* 68 F.3d 238, 240 (8th Cir.1995). Where, as here, the judge considering the § 2255 motion also conducted the trial, the judge may rely on his or her recollections of the trial. *See Blanton,* 94 F.3d at 235.

■ The district court decided not to conduct a hearing with respect to the alleged September 10 plea offer for the following reasons. First, the only pieces of evidence that a plea offer occurred are Teneyuque's report of what Dietrich said and Arredondo's observation of his lawyer shaking his head. The latter proves nothing. The former is hearsay, and none of

---

3. Arredondo also claimed in this affidavit to have heard snippets of the conversation, including references to five and ten-year sentences. This time, he stated that it was the prosecutor, not Plachta, who shook his head "no." We do not consider these recollections because Arredondo's "improved" memory is

not newly discovered evidence, and there is no reason why he should have omitted these statements from the affidavit that accompanied his original petition. We discuss the issue of Arredondo's second affidavit in part II.C., below.

the exceptions to the prohibition on hearsay evidence applies. *See* FED. R. EVID. 801–04. Second, the district court said that because Dietrich was a sequestered witness she would not have been in the courtroom at the time she allegedly overheard the plea offer. The district court's confidence in this fact is unjustified: according to the transcript, the court announced on that day that Dietrich's trial had been severed from the other defendants'. J.A. at 103 (9/10/90 Tr.). In addition, the prosecutor pointed out that *someone* who was "a potential government witness" was present in the courtroom, and the court stated, "I don't think it's of any concern." J.A. at 106 (9/10/90 Tr.). However, the fact that Dietrich may have been present does not overcome the problem that the evidence of what she may have heard is hearsay. Finally, the court stated that it had an established policy of refusing to accept negotiated pleas after the plea cut-off date, making it highly implausible that the attorneys would have bothered trying to negotiate a plea.

In short, Arredondo did not offer any admissible evidence that the plea offer occurred, and the hearsay he offered was not credible. Although we have frequently noted that " 'credibility determinations are for the trial court,' " *United States v. Zajac*, 62 F.3d 145, 148 (6th Cir.) (quoting *United States v. Crousore*, 1 F.3d 382, 385–86 (6th Cir.1993)), *cert. denied*, 516 U.S. 1032, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995), Teneyuque's allegation is incredible not because of her demeanor or other factors that a trial court is uniquely able to assess but because it is highly implausible. Therefore, it was not error for the district court to reject her allegation without holding an evidentiary hearing. *Cf. Johnson v. United States*, 239 F.2d 698, 699 (6th Cir. 1956) (affirming district court's refusal to hold § 2255 hearing when petitioner's charges "reduce to incredible hearsay statements"), *cert. denied*, 354 U.S. 940, 77 S.Ct. 1404, 1 L.Ed.2d 1539 (1957).

The earlier plea offer, however, is another matter. Plachta has not claimed to have conveyed that offer to his client, so the uncontradicted evidence at this point is Arredondo's statement that he never knew about it. That he first mentioned this issue in his Motion for Reconsideration is not fatal: Arredondo claims to have learned of this offer from the government's response to his petition. The district court denied the petition less than a month after the government filed its response, leaving Arredondo little time to reply. It is certainly possible that the government will be able to produce some evidence that Arredondo knew of the earlier plea offer. Because the government has not done so, it was error to deny reconsideration.

## B. INEFFECTIVE ASSISTANCE AT SENTENCING

### 1. Sixth Amendment Rights at Sentencing

Arredondo argues that Plachta also failed to provide him with effective assistance at sentencing. In *Strickland*, the Supreme Court "held that the same standard for evaluating claims of ineffective assistance of counsel applies to trials and to capital sentencing proceedings because '[a] capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial.' " *Caspari v. Bohlen*, 510 U.S. 383, 393, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (quoting *Strickland*, 466 U.S. at 686–87, 104 S.Ct. 2052) (first two alterations by *Bohlen* Court). Although the Supreme Court has never expressly extended the *Strickland* standard to noncapital sentencing, we have applied it in that context. *See United States v. Stevens*, 851 F.2d 140, 145 (6th Cir.1988). We also note that in the era of the Sentencing Guidelines, the *Strickland* Court's description of the similarities between a capital sentencing proceeding and a trial is equally applicable to a noncapital sentencing proceeding. The

Guidelines provide detailed and comprehensive standards for decision and were accompanied by the creation of more formal procedures designed to promote "focused, adversarial resolution of the legal and factual issues relevant to fixing Guidelines sentences." *Burns v. United States,* 501 U.S. 129, 137, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) (describing the purpose of FED.R.CRIM.P. 32). Because of the complicated and adversarial nature of a Guidelines proceeding, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), *quoted in Gideon v. Wainwright,* 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

A few courts have modified the second prong of the *Strickland* test when applying it to noncapital sentencing. Under the sentencing schemes in many state courts and in the pre-Guidelines federal courts, a sentencing judge had extremely broad discretion. *Strickland*'s prejudice prong was therefore "more easily met in the noncapital sentencing context [because] ... practically any error committed by counsel could have resulted in a harsher sentence, even if only by a year or two." *Spriggs v. Collins,* 993 F.2d 85, 88 (5th Cir.1993). The *Spriggs* court concluded that an ineffectiveness claim should establish "a reasonable probability that but for trial counsel's errors the defendant's non-capital sentence would have been significantly less harsh," *id.,* rather than the usual showing of a reasonable probability of a different outcome. The court also stated that "one foreseeable exception to this requirement would be when a deficiency by counsel resulted in a specific, demonstrable enhancement in sentencing." *Id.* at 89 n. 4.

Two other courts of appeals have used the same approach in cases involving Guidelines sentences. *See United States v. Kissick,* 69 F.3d 1048, 1055–56 (10th Cir.1995); *Durrive v. United States,* 4 F.3d 548, 550–51 (7th Cir.1993). It is un-

clear whether those courts recognize the exception noted in *Spriggs* for cases in which the difference in the sentence is specific and demonstrable. The Seventh Circuit explained the need for the heightened standard of prejudice by stating, "Small failings by counsel are not enough to turn a probable acquittal into a probable conviction; equally slight failings could turn a 115 month sentence into a 120 month sentence." *Durrive,* 4 F.3d at 550. The court acknowledged that even a small increase is tangible prejudice from the point of view of the defendant, but it concluded that more was required because "[b]efore the advent of the Sentencing Guidelines, no one would have dreamed that choices influencing the term of imprisonment within such a narrow range could be relitigated on collateral attack." *Id.* at 551. We agree that "slight failings" by counsel are not enough to establish constitutionally deficient representation, but we question whether this issue is best addressed by modifying the prejudice prong of *Strickland.* The degree of the attorney's error may better be evaluated directly, under *Strickland*'s performance prong.

For our purposes, we need not resolve today the degree of prejudice that is required for *Strickland* to apply to claims of ineffective assistance during noncapital sentence proceedings. Even under a heightened standard of prejudice, Plachta's alleged performance at sentencing—which may have increased Arredondo's sentence by as much as eight years—constitutes prejudice sufficient to implicate the *Strickland* framework. We will first discuss the prejudice—the nature and extent of the error—and then discuss whether Plachta's performance fell below objective standards of competence and violated Arredondo's Sixth Amendment right to the assistance of counsel.

**2. Prejudice**

Arredondo's sentence was based on the statement in the PSR that "it is felt" that Arredondo was responsible for "be-

tween 1 and 3 kilograms of heroin." J.A. at 152(PSR). Not coincidentally, the range "between 1 and 3 kilograms of heroin" defines a particular offense level under the Guidelines, and one kilogram is the cut-off for the mandatory twenty-year sentence under § 841(b). The PSR recited no specific facts about Arredondo's conduct or the evidence against him that would lead one to conclude he was responsible for any particular amount. The only specific fact about Arredondo's activities mentioned in the PSR was that he purchased heroin "several" times a week. J.A. at 152(PSR). *Compare United States v. Gibbs,* 174 F.3d 762, 794–95 (6th Cir.1999) (discussing the minimum indicia of reliability required in drug-quantity determinations and criticizing the district court's reliance on unsupported allegations by probation officers); *United States v. Walton,* 908 F.2d 1289, 1301–03 (6th Cir.) (holding that sentencing court must "err on the side of caution" and choose estimate of drug quantity based on preponderance of the evidence), *cert. denied,* 498 U.S. 906, 989, 990, 111 S.Ct. 273, 530, 532, 112 L.Ed.2d 229, 541, 542 (1990). The district court adopted the conclusions of the PSR. At no point during the sentencing hearing did anyone present mention a specific quantity of drugs. The district court stated only that "the offense level was a level 32." Sent. Hr'g Tr. at 3.

As Arredondo points out, even the calculations advanced in the government's brief cannot reach the one kilogram necessary to justify the twenty-year sentence. To illustrate the problems with the government's calculations, we will first compare Arredondo's drug quantities to the entire conspiracy's and then examine the direct evidence of Arredondo's purchases and sales.

According to the government's estimate, Sepulveda (the supplier) brought in 15.309 kilograms of heroin and 216 ounces of cocaine from Chicago over the course of six years, 1984 through 1989. Following the PSR, we treat the 216 ounces of cocaine as 1.224 kilograms of "heroin equivalent," which gives us 16.5 kilograms of heroin.[4] Arredondo is alleged to have been involved for three years, 1987 through 1989. Half of 16.5 kilograms is 8.25 kilograms. This estimate is probably high, since Sepulveda's business was slow after his house was raided in 1988, J.A. at 177 (Esparza Test.), so we assume roughly seven kilograms distributed by the conspiracy from 1987 through 1989.

■ The government claims that Arredondo was one of a select few dealers who could buy from Sepulveda. The government does not say how many are a few, but the trial testimony in the Joint Appendix names nine others.[5] Thus, at least ten people participated in the distribution of seven kilograms of heroin (or heroin equivalent). It seems unlikely that Arredondo alone was responsible for three kilograms; even one kilogram would be substantially more than his pro rata share. While it is possible that his role was greater than others', there is no particular evidence to support such a conclusion. Similarly, Arredondo could not have been held responsible for amounts directly attributed to other members of the conspiracy without a factual basis for the conclusion that these amounts were within the scope of his participation. *See United States v. Jenkins,* 4 F.3d 1338, 1345–47 (6th Cir.1993) (holding that Guidelines require "differentiation between co-conspirators" and that defendant's ability to foresee the total amount involved in a conspiracy was not sufficient to impose sentence based on that amount),

---

**4.** Arredondo is not accused of selling any cocaine. However, his co-conspirators apparently did. Because here we are considering how the total amount of drugs could have been allocated among all of the dealers, it makes sense to consider the total amounts of both drugs.

**5.** J.A. at 166 (Diaz Test.) (naming her husband Frank, Robert Molina, Betto Lugo, Tony Chantaca), 173 (Esparza Test.) (naming Richard Robelin, Raymond Botello, Chris Botello, Racquel Robelin, Freddie McCop).

*cert. denied,* 511 U.S. 1034, 114 S.Ct. 1547, 128 L.Ed.2d 197 (1994).

Approaching the calculation from the opposite direction, the amount of heroin Arredondo sold pursuant to the conspiracy is a function of three variables: the length of time for which he was involved in the conspiracy, the frequency with which he made purchases, and the average amount he purchased each time. Maria Diaz testified that she saw Arredondo at Sepulveda's house buying cocaine about twice a week in 1988. J.A. at 167 (Diaz Test.). Darryl Morgan obtained heroin from Arredondo two or three times a week from late 1988 to late 1989. J.A. at 195–96 (Morgan Test.). On most occasions, Arredondo sold Morgan heroin that he had purchased ahead of time; on only a few occasions did Arredondo take Morgan to Sepulveda's house to acquire the drugs. On those occasions, Morgan said that Arredondo purchased "a sixteenth," meaning one-sixteenth of one ounce, which is about 1.77 grams. J.A. at 196–97 (Morgan Test.). Maria Esparza, who lived at the house, said Arredondo was there to buy heroin "[m]aybe once a day, twice a day, depends how much you know I had—he had the money," in 1987 and 1988. J.A. at 173 (Esparza Test.). Esparza testified that during these slow years, Sepulveda was selling up to half a gram of heroin at a time. J.A. at 177 (Esparza Test.). Finally, in late 1989, Cindy Kwiatowski twice waited near the house while Arredondo went in to buy heroin. On one of these occasions, Arredondo bought a sixteenth. J.A. at 180–82, 184–87 (Kwiatowski Test.).

The government's position is that Arredondo's level of drug involvement should be computed on the basis of "conservative estimates" of three purchases per week, three years of involvement, and "the average quantity purchased"; the government does not specify what it believes the "average quantity" was. Gov't Br. at 16. However, the largest amount Arredondo was accused of buying at any time was "a sixteenth," or 1.77 grams.[6] Three purchases per week, times 156 weeks (three years), times 1.77 grams per purchase equals 828 grams—well under a kilogram.

The government also asserts that an estimate based on fourteen purchases per week would be supported by the record. That would make the total equal to 3.9 kilograms. However, the other figures in this estimate are hardly conservative. First, the government assumes three full years of regular purchases with no breaks. While Morgan's testimony has Arredondo dealing drugs in late 1989, Esparza simply said that he bought drugs at the house in 1987 and 1988. Second, the evidence does not support an inference that Arredondo bought sixteenths on a regular basis. Esparza testified that in the years Arredondo bought from Sepulveda, Sepulveda was selling a gram or less at a time—about half of a sixteenth. Also, Kwiatowski's description of the time she saw Arredondo acquire a sixteenth suggests that it was unusual. Arredondo had dropped her off to wait while he went into the house. He came back a few minutes later, saying that he could get a sixteenth if he could get more money. They then drove to an apartment

---

**6.** In denying the § 2255 motion, the district court said that Arredondo sold two grams to Morgan in 1989. However, Morgan testified to purchasing only twenty or thirty dollars worth of heroin at a time. J.A. at 197 (Morgan Test.). The district court seems to be referring to Morgan's statement that, when he went with Arredondo to Sepulveda's house, he *saw* Arredondo buying "[b]asically just 16ths of an ounce, a gram and a half to two grams," for about $135. J.A. at 197–98 (Morgan Test.). Morgan's statement explains that a sixteenth is between 1.5 and two grams; it

does not assert that Arredondo bought a sixteenth, 1.5 grams, and two grams on separate occasions.

The district court also acknowledged several purchases of well under a gram, yet stated that it was making a "conservative calculation" based on an assumption of two grams per visit. The district court's calculation, like the government's, appears erroneous. The district court stated that it was assuming 156 weeks, three purchases per week, and two grams per purchase. That works out to 936 grams—still less than one kilogram.

building where someone gave Arredondo a check, drove to a place to cash the check, and then went back to the house to buy the heroin. Clearly, the opportunity to buy a sixteenth (for about $125 to $135) was unexpected.

In sum, even the government's proposed estimates do not support the conclusion that Arredondo was directly responsible for more than one kilogram of heroin. While the government may be correct that three purchases per week is a conservative estimate, its other estimates are high. Presumably, had Plachta objected to basing Arredondo's sentence on what the probation officer "felt," this error would have been corrected either at the sentencing hearing or on appeal, resulting in either a lower sentence or the production of more evidence to support the sentence that was imposed.

Had the district court engaged in a factual inquiry into the scope of Arredondo's participation in the conspiracy, it might have reached the same sentence. However, the court chose to sentence Arredondo on the basis of the drugs for which he was directly responsible. This is a common practice and is consistent with the necessity of erring on the side of caution when calculating drug quantities. We are skeptical of the suggestion that an objection to the PSR's proposed quantity would have prompted the court to change its mind about whether to include co-conspirators' drugs in Arredondo's sentencing calculation. In evaluating whether Arredondo was prejudiced by the failure to object, we presume that the district court would have carried out its duty to arrive at a reasonable, conservative quantity on which to base the sentence, rather than manipulate the process in order to achieve a particular result.

### 3. Performance

 The government conceded at oral argument that its estimates do not produce a total above one kilogram "if you apply literally that math." It nonetheless

argued that Arredondo could not satisfy the performance prong of his ineffectiveness claim and urged on us the proposition that an attorney's failure to object to drug quantities is not ineffective if the government's estimates are "in the ballpark." We reject this argument. First, we note again that our precedents require sentencing courts to err on the side of caution when calculating drug quantities. *See* *Walton*, 908 F.2d at 1302. Nowhere do our cases suggest that a court should make a conservative calculation and then "round up" to reach a statutory minimum. The government treats the discrepancies in its calculations as trivial because a few tenths of a gram per purchase make the critical difference. But a few tenths of a gram is not an insignificant amount of heroin. For comparison, we note that the Guidelines treat one gram of heroin as equivalent to one kilogram of marijuana. *See* U.S.S.G. § 2D1.1 cmt. 10 (Drug Equivalency Tables). A reasonable attorney might choose not to quibble over small discrepancies that ultimately would not affect the client's sentence. In this case, however, Plachta's client was potentially subject to a harsh, mandatory minimum sentence under § 841(b). *The* critical issue at sentencing was whether Arredondo was responsible for more or less than one kilogram of heroin—it was the difference between twelve years and twenty years in prison.

It is not clear what, if anything, Plachta did for his client with regard to sentencing. Arredondo says that his attorney never discussed the PSR with him. Plachta promised to submit a statement to the probation officer but did not do so. Then he failed to object to a flawed sentencing calculation that was based on the government's view of the evidence and the probation officer's intuition. Even without expecting Plachta to have figured out all of the details of the calculation, a casual reading of the PSR would have revealed that it was too conclusory to provide an adequate basis for sentencing under § 841(b). Yet, he made no efforts to ensure that the

district court established an adequate factual basis for the sentence. In fact, his only substantive contribution to the sentencing hearing was to inform the district court that it had the discretion to sentence Arredondo to thirty rather than twenty years in prison. Sent. Hr'g Tr. at 5.[7]

While the government has not submitted a statement from Plachta explaining his failure to challenge Arredondo's sentence calculation, the district court surmised that Plachta's failure to object to the drug-quantity estimate was strategic. The court stated that the estimate was so conservative that any objection would have foolishly risked prompting the court to settle on a higher estimate. This would have been a remarkably poor strategic decision. Being held responsible for more than one kilogram subjected Arredondo to a twenty-year sentence under § 841(b). One kilogram is the highest cut-off used in the statute. Therefore, a person responsible for more than one kilogram receives either twenty years or the Guidelines sentence, whichever is higher. Under the Guidelines, Arredondo would have had to have been responsible for more than ten kilograms before a twenty-year sentence would be authorized. *See* U.S.S.G. §§ 2D1.1(c) and 5A.[8] Because Arredondo could not have been responsible for more than the roughly seven or eight kilograms sold by the entire conspiracy during his period of participation, there was virtually no strategic risk to challenging the PSR's drug-quantity estimate.

■ Despite the clear errors in the PSR and the lack of specific findings about Arredondo's criminal activity, Plachta did nothing to correct the PSR or prevent its adoption by the district court. A failure to investigate, participate in, and prepare for the sentencing proceedings fails to satisfy an objective standard of reasonable representation and therefore falls below Sixth Amendment standards for effective assistance of counsel. *See Spearman v. United States*, 860 F.Supp. 1234, 1244 (E.D.Mich. 1994) (holding that counsel was ineffective because, among other things, he "failed to establish at sentencing any specific computation as to any amount of cocaine base relevant to defendant's sentence; he merely accepted the prosecutor's figure"); *cf. Austin v. Bell*, 126 F.3d 843, 848–49 (6th Cir.1997) (holding that counsel's failure to investigate or present mitigating evidence at sentencing in death-penalty case constituted ineffective assistance), *cert. denied*, —— U.S. ——, ——, 118 S.Ct. 1526, 1547, 140 L.Ed.2d 677, 695 (1998); *Glenn v. Tate*, 71 F.3d 1204, 1206–08 (6th Cir.) (same), *cert. denied*, 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996). On the record before us, Arredondo has made a strong initial showing that Plachta's performance was constitutionally deficient.

## C. PROCEEDINGS ON REMAND

As we have mentioned, the district court has yet to hear Plachta's explanation of his performance. It is possible that Plachta was aware of evidence that could have

---

7. We are not sure of the basis for Plachta's statement that the district court could have imposed a thirty-year sentence. As the PSR made clear, Arredondo's range under the Guidelines was 121–151 months. While § 841(b) sets out a twenty-year minimum sentence, a court is not free to impose a sentence outside the Guidelines range other than as required by the statute unless it finds a basis for upward departure, which it cannot do without giving notice to the parties. *See* U.S.S.G. § 5G1.1(b) & cmt. (stating that when the statutory minimum is greater than the Guidelines range, the statutory minimum should be imposed and any sentence above

the minimum "would be a guideline departure"); *Burns*, 501 U.S. at 138, 111 S.Ct. 2182 (holding that Federal Rule of Criminal Procedure 32 requires notice prior to upward departure).

8. The Guidelines sentencing ranges for large quantities of heroin are as follows:

| Amount of Heroin | Offense Level | Sentence in Months | Sentence in Years |
|---|---|---|---|
| 0.7 to 1 kg | 30 | 121-151 | 10.1-12.6 |
| 1-3 kg | 32 | 151-188 | 12.6-15.7 |
| 3-10 kg | 34 | 188-235 | 15.7-19.6 |
| 10-30 kg | 36 | 235-293 | 19.6-24.4 |

provided a basis for the PSR's conclusory statements, making any objection futile or even frivolous. On remand, the district court should hold an evidentiary hearing to determine whether a reasonable attorney in Plachta's position would have attempted to convince the sentencing court that Arredondo was responsible for less than one kilogram. Arredondo will bear the burden of proving that, based on the record available to Plachta at Arredondo's sentencing hearing, Plachta's lack of action constituted a failure to act as the counsel required by the Sixth Amendment. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. If so—and we stress that the government's arguments thus far have not convinced us otherwise—then the court must hold that Arredondo was denied the effective assistance of counsel and is entitled to resentencing. Of course, should such a resentencing be necessary, the district judge may revisit the entire sentencing procedure. *See United States v. Duso,* 42 F.3d 365, 368 (6th Cir.1994).

We note an additional issue that the district court will face on remand. The district court has received a total of four affidavits from Plachta, Hluchaniuk, and Arredondo. These affidavits are materially inconsistent with each other and support an inference that one or more of the affiants has perjured himself.

Plachta and Hluchaniuk have denied discussing a plea offer on September 10, 1990, just prior to trial. Arredondo's first affidavit stated that he observed the two lawyers having a conversation that day; he relied on Teneyuque's affidavit to show that the conversation concerned a plea offer. After the district court denied his petition, he filed a second affidavit in which he claims to have heard snippets of the conversation, including references to a ten-year sentence. The second affidavit also states that Plachta "did advise [Arredondo] by stating in words to the effect that he had rejected an offer from the Government." J.A. at 108 (Arredondo Aff. 7/6/96). In the same affidavit, Arredondo states that Plachta "did *not* at any time prior to trial" inform him of any plea offer and that he "did not reject any plea offer because Counsel nor anyone else ever made me aware of one." J.A. at 108 (Arredondo Aff. 7/6/96). In his first affidavit Arredondo had claimed "[t]hat throughout the proceedings in above matter, Mr. Plachta never advised me of any Plea offer . . . ." J.A. at 33 (Arredondo Aff. 3/12/96). Hluchaniuk's revelation of the earlier offer certainly could have caused Arredondo to reinterpret his memory of the pre-trial conversation. But in light of his declaration that he "had continually harped and harped to Counsel" to obtain a plea offer, J.A. at 108 (Arredondo Aff. 7/6/96), we find it difficult to believe that Arredondo forgot about the discussion with Plachta concerning the alleged September 10 offer through the six years that encompassed his sentencing hearing, his *pro se* activity on direct appeal, and his first affidavit.

With regard to the alleged eve-of-trial plea offer, if the district court cannot reconcile Arredondo's affidavits, it must conclude that Arredondo was not being truthful either in his initial claim that Plachta never informed him of a plea offer or in his later claim that Plachta informed him that he had rejected an offer. Regarding the earlier offer, Hluchaniuk has stated that the government extended a plea offer which was rejected by defense counsel. J.A. at 58–59 (Hluchaniuk Aff. 5/31/96). Arredondo has denied receiving such an offer. Plachta has avoided the question. His affidavit states:

> I believe I cannot comment further about any specific communication I may have had with Mr. Arredondo without a specific waiver of the attorney-client privilege or pursuant to court order, but my practice has always been to communicate any plea offer made by the prosecution to my client regardless of my personal view as to the merits of the offer.

J.A. at 56–57 (Plachta Aff. 5/31/96). On remand, the district court may best proceed by ordering Plachta to address the questions that surround the first offer: i.e., whether the government made the first plea offer; if so, whether Plachta communicated the offer to Arredondo; and, if so, the nature of Arredondo's response. Either Plachta will admit that in this case he rejected a plea offer without his client's permission, or the district court will be faced with contradictory sworn statements from these three men.

Arredondo has lodged serious claims that attack his attorney's professional competence. If true, his petition deserves our attention, as Plachta's alleged failures condemned Arredondo to serve an avoidable eight extra years in prison. If false, Arredondo has lied in a self-interested endeavor that could have caused unwarranted discipline of his attorney. The courts should not encourage such actions by refusing to punish demonstrably false claims of ineffective assistance of counsel. Similarly, the courts could not countenance any attempt by an attorney to cover up professional errors at the expense of a former client's liberty. Because on remand the district court will solicit evidence to address whether the government made and Plachta conveyed the first offer, it will not tax judicial resources for the court to conduct a simultaneous investigation into the truthfulness of the statements that have been made under oath.

## III. CONCLUSION

We hold that the district court erred in rejecting Arredondo's claim that he received ineffective assistance of counsel at his sentencing hearing and in denying the Rule 59(e) motion without considering the newly discovered evidence of an early plea offer that Plachta may have failed to convey to Arredondo. We therefore **REVERSE** the district court's denial of the motion for reconsideration, **VACATE** the district court's denial of the petition to vacate, and **REMAND** this case for proceedings consistent with this opinion.