RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0245P (6th Cir.)
File Name: 03a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

Nos. 99-2147;
01-2044

MIKE DARWICH,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-80508—Lawrence P. Zatkoff, Chief District Judge.

Argued: October 31, 2002

Decided and Filed: July 24, 2003

Before: KEITH, KENNEDY, and MOORE, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Robert M. Morgan, Detroit, Michigan, for
Appellant. Kathleen Moro Nesi, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** Robert M. Morgan, Detroit, Michigan, for

Appellant. Kathleen Moro Nesi, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which
KEITH, J., joined. KENNEDY, J. (pp. 36-39), delivered a
separate opinion concurring in part and dissenting in part.

———————

## OPINION

———————

KAREN NELSON MOORE, Circuit Judge. Defendant-
Appellant Mike Darwich ("Darwich") appeals from the
eighty-eight month sentence imposed by the district court
after he was convicted of conspiracy to distribute marijuana
in violation of 21 U.S.C. § 846, and after he was subject to
criminal forfeiture pursuant to 21 U.S.C. § 853. Darwich
challenges the standard of proof used to establish drug
quantity for sentencing, the sufficiency of the evidence used
to prove drug quantity, and the receipt of firearm and
leadership-role sentence enhancements.

Darwich was indicted for various drug-related crimes.
Pursuant to a plea agreement, Darwich pleaded guilty to the
conspiracy to distribute marijuana charge and agreed to the
criminal forfeiture. The plea agreement, expressly noting the
parties' decision to present evidence on the amount of
marijuana at issue, stated that Darwich's prison sentence
would not exceed ninety-six months. Thereafter, a probation
officer prepared a presentence investigative report ("PSR")
calculating Darwich's base offense level at 26, to which
Darwich objected. The PSR arrived at this base offense level
calculation through the use of a drug quantity averaging
formula that held Darwich responsible for five pounds of

marijuana per week for the length of the conspiracy.[1] The district court agreed with the PSR and determined that Darwich's conspiracy involved 236 kilograms of marijuana. Darwich was sentenced to eighty-eight months in prison and four years of supervised release, and he immediately filed an appeal. Subsequent to the filing of the appellate briefs but before oral argument, the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In light of the Court's decision in *Apprendi* and the government's failure to allege any specific quantity of marijuana in the indictment, both Darwich and the government filed motions in this court to waive oral argument and requested that the case be remanded to the district court for resentencing to the statutory maximum of sixty months pursuant to § 841(b)(1)(D). On remand, the district court declined to consider the parties' sentence stipulation and determined that the evidence that the conspiracy involved 236 kilograms of marijuana was established beyond a reasonable doubt. Darwich, thereafter, filed this current appeal. We now **REVERSE** the district court's determination of the amount of drugs, **VACATE** Darwich's sentence because it was error for the district court to find that the necessary drug quantity was proven beyond a reasonable doubt and because the district court failed to issue a ruling on the disputed matter of Darwich's leadership role, and **REMAND** for resentencing to no more than sixty months in accordance with this opinion.

---

[1] The formula used was set forth in an addendum to the PSR and was accepted by both district court opinions: "453.6 grams (equivalent to one pound of marijuana) x 5 days per week x 52 weeks per year x 2 years that the conspiracy spanned. This resulted in a total of 235,872 grams of marijuana divided by 1,000 (grams to kilograms conversion) equals a total of 236 kilograms of marijuana." Joint Appendix ("J.A.") at 550 (7/10/01 Dist. Ct. Op. & Or.). United States Sentencing Guidelines ("U.S.S.G.") §§ 2D1.1(a)(3) and 2D1.1(c)(7) provide that a base offense level of 26 is required for offenses involving at least 100 but less than 400 kilograms of marijuana. U.S.S.G. §§ 2D1.1(a)(3), 2D1.1(c)(7) (1998).

## I. BACKGROUND

Darwich owned and operated the Canfield Market in Detroit, Michigan. The market sold snacks and alcoholic beverages but did not sell any milk, eggs, or bread. Market customers also were able to purchase nickel bags of marijuana from Darwich. According to Tom Smith ("Smith"), a former employee of the market, an estimated nine out of ten market customers purchased marijuana from Darwich. Darwich stored the marijuana on his person and in Pringles brand potato chip cans on the store shelves. The market's covert operations were uncovered when the FBI investigated whether police officers were protecting a drug business at the market.

On June 18, 1998, Darwich was indicted for conspiracy to distribute marijuana in violation of 21 U.S.C. § 846; use or carrying of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) & (2); possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1); two counts of maintaining a place for distributing and using marijuana in violation of 21 U.S.C. § 856; and criminal forfeiture pursuant to 21 U.S.C. § 853. The indictment alleged that the conspiracy took place between March 1996 and April 1998. Darwich subsequently entered into a Rule 11 plea agreement on the marijuana conspiracy charges under 21 U.S.C. § 846 and agreed to the criminal forfeiture under 21 U.S.C. § 853. The government dismissed all other charges brought against Darwich. Although the parties did not agree on a computation of the sentencing guidelines or a base offense level, they agreed to present evidence to the court for sentencing purposes, and the plea agreement stated that Darwich's prison sentence would not exceed ninety-six months.

A probation officer's calculations for the PSR set Darwich's base offense level at 26, for distribution of more than 100 but less than 400 kilograms of marijuana. Darwich objected to this base offense level calculation and together

with the United States Attorney made an unsuccessful attempt to stipulate to a specific sentence at the hearing on Darwich's objections to the PSR. The district court declined to accept the stipulated sentence, and instead held an evidentiary hearing on the issue of marijuana quantity. At this evidentiary hearing, the court heard testimony from four individuals, involved with or knowledgeable of the conspiracy, addressing the question of drug quantity.

The first witness was Agent Kyle Dodge ("Dodge"). A substantial portion of Dodge's testimony consisted of his summary recitation of the witnesses' testimony before the grand jury. Dodge testified that: (1) Ira Earehart testified that on ten occasions he purchased marijuana in quantities ranging from a nickel bag to one-quarter of a pound, and that on twenty occasions he purchased pound quantities; (2) Leon Lippett ("Lippett") testified that eight out of ten Canfield Market customers purchased marijuana; (3) Arnita Easterling ("Easterling") testified that sometime in or around July 1997 she began bagging nickel bags of marijuana three times a week and that other "camel people"[2] also bagged marijuana; (4) Arthur Pace testified that in the fall of 1997 he bagged a pound of marijuana into nickel bags each night; (5) Jillian Drappeaux ("Drappeaux") testified that she purchased marijuana from the market approximately twenty times in quantities of a pound or less; (6) Odestser Pace testified that as a market employee she sold nickel bags of marijuana; (7) Jason Alquiza ("Alquiza") testified that he regularly purchased marijuana at the market in quantities up to a pound; (8) Smith, a market employee, testified that during his shift nine out of ten customers came to purchase marijuana and that ordinarily there were sixty-five to seventy market customers during his shift; and (9) Kevin Dempsey testified that he worked at the market and assisted Darwich with the sale of marijuana. Dodge provided additional drug quantity

---

[2]Before the grand jury, Easterling testified that there were other baggers whom Darwich referred to as the "camel people."

evidence, informing the sentencing court that approximately 655.4 grams of marijuana were uncovered at the market during the search.

The next witness to testify was Orlando Rush ("Rush"), a federal prisoner incarcerated for possession with intent to distribute crack cocaine. The government secured Rush's testimony against Darwich by agreeing to recommend that Rush be released on bond and that his sentence be reduced to time served. Rush testified that he bought nickel bags from Darwich for personal use "basically every day"[3] over the course of approximately nine months prior to Rush's arrest. Joint Appendix ("J.A.") at 440 (Mot. Hr'g, Rush Direct). He also testified that when he needed extra money he would buy anywhere from one-half of an ounce to one pound for further resale during the same nine-month timeframe.[4] Rush further testified that Darwich sold approximately a pound of marijuana each day. When questioned as to how he arrived at this figure, Rush noted that his nephews (also known as the "camel people") worked as marijuana baggers at Darwich's home and that they would sometimes tell him that they bagged from one to two pounds at night.[5]

---

[3]It is unclear from Rush's testimony precisely how much marijuana he purchased "basically every day." When asked how many nickel bags he would purchase at one time, Rush replied: "Sometimes three to five bags, something like that." J.A. at 441 (Mot. Hr'g, Rush Direct).

[4]On cross examination, defense counsel impeached Rush with a prior affidavit from his own arrest in which he told the arresting officers that he had been selling marijuana over the past two months only. J.A. at 452-53 (Mot. Hr'g, Rush Cross Exam.).

[5]Specifically, Rush testified that "[S]ometimes when I dropped one of them off they tell me that, you know, if I picked them up I seen them the next day, that I packed up a pound or I did two pounds or a pound and a half, like that, you know." J.A. at 443 (Mot. Hr'g, Rush Direct). On re-cross examination Rush stated that his nephews worked "[p]ossibly every night because [he] would drop them off just about every day, every night." J.A. at 456 (Mot. Hr'g, Rush Re-cross Exam.).

Darwich called the next witness, Easterling. Easterling testified that she began bagging marijuana in September 1997. She also testified that she did not bag every day and that there were periods of time when she did not bag marijuana at all. Easterling indicated that she worked three or four days each week. Although Easterling never weighed the marijuana, she initially estimated that she bagged one-half of a pound to one pound on the days when she worked. After further probing, Easterling admitted that it actually may have been less than one-quarter of a pound and that she really did not know the precise figure. In addition, Easterling testified that during her twelve-hour work days, she never saw anyone besides Darwich and Dempsey, thereby eliminating any possibility that she worked in conjunction with Rush's nephews. In response to a question from the judge, Easterling responded that she filled 300 to 325 nickel bags on the days when she worked.

The final witness was Smith, a Canfield Market employee. On direct examination, Smith admitted that he was not at the store every day and that there were times when he was absent due to vacation, hospitalization, and his other jobs. He also testified that between 1997 and the early part of 1998, the store was closed for at least four weeks. Smith admitted seeing Darwich sell nickel bags of marijuana, but testified that he never saw Darwich distribute any larger amounts. Although Smith admitted that his statement before the grand jury that nine out of ten customers bought marijuana was a guess, on cross examination he repeated that during his shift,[6] nine out of ten customers bought nickel bags.

At the completion of the four witnesses' testimony, the court instructed the parties to submit briefs arguing their

---

[6]Smith worked the evening shift from 5:00 p.m. until closing. Smith testified that Darwich closed the store between 10:00 and 11:00 p.m. However, Dodge was recalled at the end of the evidentiary hearing and testified that the electronic surveillance indicated the store closed almost every night at 9:00 p.m.

positions on sentencing. Ultimately, the district court agreed with the PSR calculations and the government when it determined that Darwich was responsible for the distribution of 236 kilograms of marijuana. The district court explained its reasoning:

> Several witnesses' testimony established that Defendant sold marijuana in large quantities. Earhardt's [sic] grand jury testimony established that he bought "nickel bags" from Defendant ten times and a pound of marijuana on twenty occasions. Drappeaux's grand jury testimony showed that she purchased up to one pound of marijuana from Defendant more than twenty times. Alquiza testified before the grand jury that he was a regular purchaser of marijuana at the Canfield Market, purchasing up to a pound at a time. Finally, Orlando Rush testified at the evidentiary hearing that he would purchase anywhere from one ounce to one pound of marijuana from Defendant for resale, plus smaller amounts for personal use.

> In addition to Defendant's large-quantity sales, the testimony at the hearing demonstrated that Defendant also sold a great deal of marijuana in smaller quantities. Arthur Pace's grand jury testimony established that Defendant paid him $300 a week to bag marijuana. Easterling testified at the hearing that she would bag anywhere from a half pound to a pound of marijuana for Defendant. Further she stated that when she did work, she filled between 300 and 325 bags of marijuana.

> This Court was also impressed by the testimony which showed that the Canfield Market was basically a drug operation and not a market selling legitimate consumer goods. Lippett testified before the grand jury that eight of ten customers at the Canfield Market were there to purchase marijuana. Smith testified before the grand jury that nine of ten customers at the Canfield Market purchased marijuana. Smith reiterated this testimony at

the hearing, again stating that nine of ten customers purchased marijuana. Smith also testified that the Canfield Market did not have any milk, eggs, or bread in the store.

Finally, Rush testified that his nephews worked for Defendant for about two years. Rush's nephews worked every night, and Rush was aware of this fact because he would drive his nephews to Defendant's house. Rush learned, through his nephews, that they would package between one and two pounds of marijuana a night for Defendant.

*United States v. Darwich*, No. 98-80508, at 10-11 (Sept. 30, 1999).

On October 4, 1999, Darwich was sentenced to eighty-eight months in prison and four years of supervised release. That same day, Darwich filed a notice of appeal to this court. The central argument he raised in his appellate brief was that even though the United States Attorney and Darwich had stipulated to a base-offense-level calculation, the district court predetermined the sentence Darwich would receive based on the ninety-six month figure in the plea agreement without considering the stipulation or the testimony at the evidentiary hearing. Specifically, the district judge said on the record, "I took a plea wherein the Court was under the impression that ninety-six months was the cap and that's what I think is appropriate in this case." J.A. at 498 (Mot. Hr'g). In contrast, the government argued that the district court merely declined to accept the parties' proffered modified plea agreement which stipulated the sentence and instead the court affirmed its adherence to the ninety-six month cap provided in the original Rule 11 plea agreement. In essence, the government argued, the district court merely refused to surrender its function of determining the appropriate sentence.

After the government and Darwich filed their briefs for the first appeal but before oral argument, the Supreme Court

decided *Apprendi*. In light of the Court's decision in *Apprendi* and the government's failure to allege any specific quantity of marijuana in the indictment, both Darwich and the government filed motions in this court waiving oral argument and requesting that the case be remanded to the district court for resentencing to the statutory maximum of sixty months consistent with 21 U.S.C. § 841(b)(1)(D). The motion was granted, and on remand, the district court adamantly declined to resentence Darwich pursuant to § 841(b)(1)(D). The court stated that it had expended resources on Darwich's case and had found that he was responsible for 236 kilograms of marijuana. In its opinion issued on July 10, 2001, and relying on *United States v. Strayhorn*, 250 F.3d 462 (6th Cir. 2001), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002),[7] the district court determined that, although quantity was not alleged in the indictment, the evidence on quantity was established beyond a reasonable doubt. The district court relied on the same analysis contained in its September 30, 1999 opinion and concluded that Darwich was responsible beyond a reasonable doubt for more than 100 but less than 400 kilograms of marijuana. On July 16, 2001, Darwich appealed to this court from the district court's judgment resentencing him to eighty-eight months of imprisonment based on its determination that the quantity evidence was proved beyond a reasonable doubt.[8]

---

[7]*Strayhorn* concludes that on remand a district court can correct an *Apprendi* error in the guilty plea context by determining the necessary drug quantity under the proper beyond-a-reasonable-doubt standard or by adhering to 21 U.S.C. § 841(b)(1)(D) and the Sentencing Guidelines to resentence the defendant. *United States v. Strayhorn*, 250 F.3d 462, 471 (6th Cir. 2001).

[8]The original appeal in this case was numbered No. 99-2147. After the district judge issued its second opinion on remand, the parties moved to recall the mandate in the 99-2147 appeal, and a divided panel of this court granted the motion to recall the mandate. On November 29, 2001, we granted Darwich's motion to consolidate the 99-2147 appeal with his appeal from the district court's second opinion on remand.

## II. ANALYSIS

### A. *Apprendi* Error

The district court on remand chose to reassess the evidence against Darwich and determined that the same evidence that established Darwich's involvement with at least 100 kilograms of marijuana by a preponderance of the evidence pre-*Apprendi* was sufficient to meet the beyond-a-reasonable-doubt requirement post-*Apprendi*. In order for the district court to have reached this conclusion, it must have found Darwich responsible for at least fifty kilograms of marijuana beyond a reasonable doubt,[9] for otherwise his eighty-eight month sentence would have exceeded the statutory maximum alleged in the indictment. To arrive at this conclusion, the district court relied on the same evidence that it used when it found by a preponderance of the evidence that Darwich was responsible for 236 kilograms of marijuana, which included substantial hearsay testimony. In this consolidated appeal, Darwich argues that the district court improperly concluded that the drug quantity necessary to sentence him to eighty-eight months in prison pursuant to 21 U.S.C. § 841(b)(1)(C), U.S.S.G. § 2D1.1(a)(3), and U.S.S.G. § 2D1.1(c)(7) was proved beyond a reasonable doubt. Thus, our analysis will focus on the specific question of whether a district court's use of hearsay testimony to establish drug quantity beyond a reasonable doubt violates *Apprendi*. This is a question of first impression in the courts of appeals.

---

[9] If the district court could not find fifty kilograms beyond a reasonable doubt, then the district court would have been unable to sentence Darwich under § 841(b)(1)(C) with a maximum sentence of twenty years and instead would have had to sentence him under § 841(b)(1)(D). Section 841(b)(1)(D) provides for a maximum sentence of five years (or sixty months) when the amount of marijuana established is less than fifty kilograms. Thus, without finding beyond a reasonable doubt the necessary fifty kilograms to bring Darwich's sentence within the purview of § 841(b)(1)(C), Darwich's eighty-eight month sentence would violate the sixty-month statutory maximum contained in § 841(b)(1)(D).

The Supreme Court announced in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. After the landmark decision in *Apprendi*, we determined that the federal drug statute's progression of increased maximum penalties based on the amount of drugs in possession triggers *Apprendi*'s protection. *See Strayhorn*, 250 F.3d at 467-68; *see also United States v. Zidell*, 323 F.3d 412, 427-28 (6th Cir. 2003) (stating that *Apprendi* requires a defendant to be sentenced using the default statutory maximum "unless the jury determines beyond a reasonable doubt that the offense involved a quantity of drugs that triggers an enhanced statutory maximum"); *United States v. Copeland*, 321 F.3d 582, 602 (6th Cir. 2003) (reiterating that we require proof beyond a reasonable doubt when sentencing drug offenders under the "higher tiers" of the scheme set forth in § 841(b)). Thus, for the purpose of establishing the statutory-maximum sentence for drug offenses, the drug amount must be proved beyond a reasonable doubt. *United States v. Garcia*, 252 F.3d 838, 842 (6th Cir. 2001). In *United States v. Flowal*, 234 F.3d 932 (6th Cir. 2000), *overruled on other grounds by Leachman*, 309 F.3d at 383,[10] we held that each provision of § 841(b)

---

[10] *Leachman* partially overruled a number of cases in this circuit, *see, e.g.*, *United States v. Harper*, 246 F.3d 520 (6th Cir. 2001), and *United States v. Humphrey*, 287 F.3d 422 (6th Cir. 2002), to the extent that the Supreme Court in *Harris v. United States*, -- U.S. --, 122 S. Ct. 2406 (2002), held that *Apprendi*'s protections only extend to those situations where a fact not proved beyond a reasonable doubt enhances a defendant's sentence beyond the statutory maximum, and does not extend to those cases where the fact only increases the defendant's statutory mandatory minimum. We note that these cases remain binding precedent except insofar as they are inconsistent with *Harris*'s rule regarding statutory mandatory-minimum sentences. We cite these cases for the proposition that the subsections of § 841(b) require that the drug quantity be proved beyond a reasonable doubt or else the defendant can receive only the default statutory-maximum penalty for offenses which do not state drug quantity. *See generally United States v. Lopez*, 309 F.3d 966,

provides for a different criminal offense with separate elements which all must be proved beyond a reasonable doubt when a defendant guilty of a marijuana conspiracy is sentenced in excess of the default statutory maximum set out in § 841(b)(1)(D). *Id.* at 938; *see also United States v. Bartholomew*, 310 F.3d 912, 925 (6th Cir. 2002) (continuing to hold, after *Leachman*, that § 841(b)(1)(D) is the statutory maximum sentence for conspiring to distribute an undetermined amount of marijuana), *cert. denied*, -- U.S. --, 123 S. Ct. 1005 (2003).

An *Apprendi* violation not only can occur when a case proceeds to trial but also can occur when a defendant pleads guilty to a drug offense. *See Strayhorn*, 250 F.3d at 468. If an *Apprendi* error occurs in a situation involving a guilty plea, the district court can cure the error by finding drug quantity beyond a reasonable doubt and sentencing the defendant accordingly. *Id.* at 471. The justification for applying *Apprendi* in the guilty plea context is that:

> the defendant who pleads guilty to an unspecified amount of drugs and is then sentenced under the preponderance-of-the-evidence standard may just as easily be subjected to an enhanced sentence in excess of the default statutory maximum as the defendant who takes his case to trial and is then sentenced by the district court under the same preponderance-of-the-evidence standard.

*Id.* at 468. Because *Strayhorn* requires the district court, when the defendant is subject to an enhanced sentence, to consider "the determination of drug quantity under § 841(b) . . . [as] an element of the offense rather than a sentencing

---

970 (6th Cir. 2002) (noting that because the jury did not find beyond a reasonable doubt the necessary cocaine amounts for sentencing under §§ 841(b)(1)(A) or 841(b)(1)(B), *Apprendi* would require that the defendant be sentenced under the default statutory-maximum provision for cocaine contained in § 841(b)(1)(C)).

factor," we must review whether the district court's use of hearsay testimony to establish the necessary drug quantity beyond a reasonable doubt is appropriate in light of *Apprendi*'s holding. *Id.* (citing *United States v. Ramirez*, 242 F.3d 348, 351 (6th Cir. 2001)).

**1. Hearsay Testimony**

Although failure to raise an objection in the district court to preserve an *Apprendi* issue limits appellate review to a plain error inquiry, *see United States v. Page*, 232 F.3d 536, 543 (6th Cir. 2000) (citing Fed. R. Crim. P. 52(b)), a pre-*Apprendi* defendant's objection at the sentencing hearing to the quantity of drugs and the judge's determination by a preponderance of the evidence is sufficient to entitle the defendant to de novo review. *See Copeland*, 321 F.3d at 601; *Humphrey*, 287 F.3d at 445. In *Strayhorn*, the defendant preserved his challenge to his sentence by repeatedly objecting to the drug quantity determination at the plea hearing, at the sentencing hearing, and in written objections to the calculation of his base offense level in his presentence report. *See Strayhorn*, 250 F.3d at 467. We determined that although Strayhorn did not "utter the words 'due process,'" he nonetheless preserved his challenge to the drug quantity determination. *Id.* Much like *Strayhorn*, Darwich adequately preserved his constitutional challenge to the quantity determination under *Apprendi*. Darwich consistently objected, both in writing and orally, to the PSR's computation of a specific drug amount. Darwich objected to the drug quantity at the evidentiary hearing, referencing the objections raised in his letter to the Probation Department after it assessed the quantity. Darwich also alerted the district court, at the plea hearing, that the amount of marijuana was in dispute. Thus, we review Darwich's

*Apprendi* challenge de novo because he adequately preserved his quantity claim.[11]

We have repeatedly held that hearsay is permissible at a sentencing hearing so long as it has some minimum indicia of reliability. *United States v. Davis*, 170 F.3d 617, 622 (6th Cir.), *cert. denied*, 528 U.S. 861 (1999); *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985). Federal Rule of Evidence 1101(d)(3) provides that the rules of evidence are "inapplicable" to "[m]iscellaneous proceedings," including sentencing hearings. Fed. R. Evid. 1101(d)(3). Although we recognize this court's traditional acceptance of hearsay testimony at sentencing, we take our direction from *Strayhorn* that drug quantity is considered an element of the offense and not a sentencing factor when such quantity alters the statutory-maximum sentence the defendant could receive. *Strayhorn*, 250 F.3d at 468 (citing *Ramirez*, 242 F.3d at 351); *see also Zidell*, 323 F.3d at 427-28 (noting that specific cocaine quantities must be proved beyond a reasonable doubt in order to sentence a defendant using the enhanced-penalty provisions of 21 U.S.C. §§ 841(b)(1)(A) and 841(b)(1)(B)). In keeping with this principle, we hold that the normal rules of evidence should apply when *Apprendi* requires the district court to find the drug quantity beyond a reasonable doubt, and therefore it is not permissible to use hearsay evidence to reach the fifty-

---

[11]While it is true that a defendant's failure to object to his sentence before the district court on the same ground raised on appeal limits our review to plain error, *United States v. Stubbs*, 279 F.3d 402, 407 (6th Cir. 2002), we conclude that de novo review is appropriate because Darwich objected to Rush's hearsay testimony in a supplement to his objections to the PSR. J.A. at 84 (Supp. to Sentencing Mem. & Objections). Thus, even though the gravamen of Darwich's appeal involves a determination of whether *Apprendi* allows hearsay testimony to be considered in proving drug quantity beyond a reasonable doubt, de novo review remains the proper standard of review because Darwich objected to his sentence before the district court on the same grounds.

kilogram quantity needed to sentence Darwich under § 841(b)(1)(C).

In the present case, the district court relied extensively on Rush's testimony[12] that his nephews sometimes told him how many pounds of marijuana they bagged a night when he picked them up or happened upon them the next day. Rush's testimony regarding his nephews' statements constitutes an out-of-court statement "offered in evidence to prove the truth of the matter asserted," and it therefore meets the definition of hearsay provided in Federal Rule of Evidence 801(c). Fed. R. Evid. 801(c). However, Rule 801(d)(2)(E) provides that a statement is not hearsay if: "[t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "In order to admit the statement of a co-conspirator under . . . [Rule] 801(d)(2)(E), it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made in furtherance of the conspiracy." *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc) (internal quotation marks omitted); *see also United States v. Hamilton*, 689 F.2d 1262, 1268 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117 (1983) (noting that these elements must be proved by a preponderance of the evidence). A

---

[12]Specifically, the testimony revealed:

MR. TURKEL:  And you said [your nephews] indicated to you the amount of marijuana that [Darwich] was selling?

MR. RUSH:  That they would package up each night.

MR. TURKEL:  What did they tell you?

MR. RUSH:  Well, sometimes when I dropped one of them off they tell me that, you know, if I picked them up I seen them the next day, that I packed up a pound or I did two pounds or a pound and a half, like that, you know.

J.A. at 443 (Tr. of Mot. Hr'g, Rush Direct Exam.).

statement is considered to be in furtherance of the conspiracy "if it is intended to promote the objectives of the conspiracy." *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997) (quotation omitted); *Hamilton*, 689 F.2d at 1270; *see also United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989) ("We recently emphasized that the in furtherance requirement of Rule 801(d)(2)(E) is a *limitation* on the admissibility of coconspirators' statements that is meant to be taken seriously." (internal quotation marks omitted)).

Applying the test of *Gessa*, we do not question that a conspiracy existed or that Darwich was an active participant in the conspiracy. However, we conclude that Rush's nephews' statements were not made in furtherance of the conspiracy. As an initial matter, it is quite clear that mere "idle chatter or casual conversation about past events" is not considered a statement "in furtherance of the conspiracy." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quotation omitted); *see also United States v. Salgado*, 250 F.3d 438, 449-50 (6th Cir.), *cert. denied*, 534 U.S. 916 *and* 534 U.S. 936 (2001); *United States v. Foster*, 711 F.2d 871, 880 (9th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984) (noting that "mere narrative declarations" made without the intent to induce assistance for the conspiracy do not fall within the "strict requirements" of Rule 801). The nephews' statements as to how much marijuana they bagged were neither attempts to "keep[] co-conspirators advised," *Tocco*, 200 F.3d at 419, nor were they "[s]tatements that identify participants and their roles in the conspiracy." *Monus*, 128 F.3d at 393 (internal quotation marks omitted). It is apparent from the transcripts of Rush's testimony that these statements were casual conversation about past events. Rush's testimony itself indicates that his nephews made these statements only occasionally; if he happened to pick his nephews up or see them in passing, they "sometimes" mentioned to him how much marijuana they had bagged the previous night. J.A. at 443 (Tr. of Mot. Hr'g, Rush Direct Exam.). In sum, these statements are simply casual conversation — indicative of how hard the nephews worked on a particular evening — and,

other than the illegal nature of the work, are no different than a statement by a farmer that he harvested forty acres of wheat by sundown. Because Rush's testimony with respect to his nephews' out-of-court statements is hearsay[13] that does not fall within an exception to the general rule, it was error for the district court to rely on this evidence.

Without Rush's testimony regarding his nephews' statements, the only other way for the district court to reach the necessary fifty kilograms beyond a reasonable doubt is through Dodge's testimony restating the testimony of grand jury witnesses. If permissible evidence, Dodge's testimony would provide substantial evidence on the drug quantity question. However, Agent Dodge's testimony also comes within the definition of hearsay provided in Federal Rule of Evidence 801(c) because it constitutes an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). One potentially applicable exception, Federal Rule of Evidence 804(b)(1), provides that former testimony, "given as a witness at another hearing of the same or a different proceeding," will not be excluded by the hearsay rule if the declarant is unavailable and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). Here, regardless of whether the grand jury witnesses properly could be considered "unavailable," Darwich had no opportunity to cross examine these witnesses.[14] Therefore, the grand jury testimony does not fall

---

[13] Rush also testified regarding his own purchases from Darwich of marijuana for personal use and for resale. The district court could have relied on this testimony in its attempt to determine whether the evidence establishes fifty kilograms beyond a reasonable doubt.

[14] We note that both Easterling and Smith testified at the evidentiary hearing on Darwich's objections to the PSR's drug quantity calculations and, thus, were subject then to cross examination. Conservatively calculating the amount of drugs mentioned in their combined testimony,

within the former-testimony exception to the hearsay rule. *Cf. United States v. Foster*, 128 F.3d 949, 954-56 (6th Cir. 1997) (holding that when the defendant's witness is unavailable and the *government* had the same *motive and opportunity* to develop the witness's testimony at the grand jury proceeding, the requirements of 804(b)(1) are satisfied).

On occasion, when a statement is inadmissible hearsay under Federal Rules of Evidence 803 and 804, it still can be admitted under Federal Rule of Evidence 807, the residual hearsay exception.[15] *United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001), *cert. denied*, 534 U.S. 1151 (2002);[16] *see also United States v. Barlow*, 693 F.2d 954, 961-63 (6th Cir. 1982), *cert. denied*, 461 U.S. 945 (1983) (holding that the grand jury testimony of an unavailable[17] witness "under

---

however, we cannot reach the necessary drug quantity beyond a reasonable doubt.

[15]Rule 807 states:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807.

[16]I dissented in *Laster* based on the majority's expansive reading of the residual hearsay exception that directly conflicted with both the plain language of the Rule and the legislative history. *See Laster*, 258 F.3d at 533 (Moore, J., dissenting). Although I continue to believe that my view is the proper interpretation of Rule 807, I recognize that *Laster* is the current law of the circuit.

[17]In *Barlow*, we defined unavailability as including a situation when "a witness persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." *Barlow*, 693 F.2d at

---

certain circumstances" is admissible pursuant to Rule 807). This rule requires that before Rule 807 can apply, the evidence must have "equivalent circumstantial guarantees of trustworthiness" as compared to evidence admitted under the other hearsay exceptions contained in Rules 803 and 804. Fed. R. Evid. 807; *see Barlow*, 693 F.2d at 962. In addition, as stated by the rule, the evidence admitted must go to a "material fact," must be more probative than any other evidence that reasonably could have been procured, and its admission must support the general purposes of the Rules of Evidence and "the interests of justice." Fed. R. Evid. 807; *see United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995). While balancing all of these concerns, the district court also must consider the "independent restrictions" on the admission of certain evidence contained in the Confrontation Clause of the Sixth Amendment which protects a criminal defendant's right to confront the witnesses against him and to challenge their testimony through cross examination. *Canan*, 48 F.3d at 959-960.

Without proper cross examination,[18] the statements of Rush's nephews cannot be deemed to have "equivalent circumstantial guarantees of trustworthiness." These statements were off-the-cuff estimations subject to miscalculations and/or inaccurate representations, creating the precise type of problem that the hearsay rule is designed to prevent. An opportunity to cross examine Rush's nephews in this situation is the only way that Darwich would be able to

---

961 (internal quotation omitted) (analyzing the precursor to Rule 807, Rule 804(b)(5)). When analyzing the admissibility under the Confrontation Clause of prior testimony, the Supreme Court has stated that the declarant must be unavailable and the testimony must have sufficient indicia of reliability. *See White v. Illinois*, 502 U.S. 346, 354 (1992); *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980).

[18]The Supreme Court considers cross examination to be the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (internal quotation and citation omitted).

explore any concerns with the integrity and accuracy of these statements. Moreover, we also must consider the source when evaluating the reliability of this hearsay testimony. The testimony was offered by Rush when he was in a likely position to supply self-serving testimony. While this testimony does not exculpate Rush at the expense of implicating Darwich, it is the exact testimony the government sought when it presented Rush with a deal. Rush's testimony suffers from the same infirmities as that of a coconspirator because the government promised Rush a chance at a reduced sentence in exchange for his testimony against Darwich. *See United States v. Gomez-Lemos*, 939 F.2d 326, 332 (6th Cir. 1991); *see generally Bruton v. United States*, 391 U.S. 123, 141 (1968) (White, J. dissenting) (stating that the confession of a codefendant is less credible than ordinary hearsay evidence "[d]ue to [the codefendant's] strong motivation to implicate the defendant and to exonerate himself"); *Miller v. Field*, 35 F.3d 1088, 1092-93 (6th Cir. 1994) (noting that with respect to testimony from the alleged assailants who were also facing criminal charges, "the possibility certainly existed that they would tailor their comments to the investigator so as to promote their own best interests"). As a final matter, although the nephews' statements regarding drug quantity go to a material fact, the government has not shown that Rush's hearsay testimony is "more probative" than any other evidence it could have procured using reasonable efforts.

To ensure "equivalent circumstantial guarantees of trustworthiness" in the context of admitting grand jury testimony under the residual hearsay exception, *Barlow* listed the important factors, including: "the declarant's relationship with both the defendant and the government, *the declarant's motivation to testify before the grand jury*, the extent to which the testimony reflects the declarant's personal knowledge, whether the declarant has ever recanted the testimony, and the existence of corroborating evidence available for cross-examination." *Barlow*, 693 F.2d at 962 (emphasis added). With respect to Dodge's testimony repeating the statements of the grand jury witnesses, many of whom were arguably

coconspirators, this court stated in *Gomez-Lemos* that there is "a strong presumption against the trustworthiness of co-conspirators' statements that are made after a conspiracy has terminated in arrest." *Gomez-Lemos*, 939 F.2d at 329. We further stated that: "outside of the co-conspirator exception to the hearsay rule (where a statement is made during the course of the conspiracy and not after it has ended), the Supreme Court has consistently concluded that the uncross-examined testimony of an alleged co-conspirator is not sufficiently reliable to meet the requirement of the Confrontation Clause." *Id.* at 332. Thus, we conclude that this grand jury testimony, at least with respect to those grand jury witnesses who did not also testify at the evidentiary hearing,[19] lacks the necessary reliability to fall within the residual hearsay exception.[20]

## 2. Insufficient Remaining Evidence

The only remaining evidence that the district court can use to arrive at the fifty-kilogram mark beyond a reasonable doubt comes from Easterling's and Smith's testimony at the evidentiary hearing, Dodge's testimony regarding marijuana seized during the search, and Rush's testimony regarding his own purchases. Dodge testified that during the search of the market approximately 655.4 grams (.655 kilograms) of marijuana was confiscated. Rush testified that he bought three to five nickel bags of marijuana "basically" every day from Darwich over a nine-month period. During the same

---

[19]All grand jury witnesses, other than Easterling and Smith, fall within this category.

[20]Even if the hearsay testimony could have been considered reliable and trustworthy, it still would not be admissible under Rule 807. Rule 807 requires that the "statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." In this case the government has not shown how it exerted reasonable efforts to secure the testimony of the grand jury witnesses at the evidentiary hearing as requested by Darwich.

nine months, he also purchased anywhere from a half ounce to a pound every couple of weeks for further resale. Although Easterling admitted that there were times when she did not bag marijuana for Darwich, she estimated that, starting in September 1997, she worked three to four days a week bagging nickel bags for Darwich. Easterling attempted to calculate the amount of marijuana she bagged in terms of pounds per day but ultimately testified that she filled between 300 and 325 nickel bags each day she worked. Smith testified that nine out of ten market customers purchased nickel bags during his shift at the Canfield Market.

We previously have instructed that "when choosing between a number of plausible estimates of drug quantity, . . . a court must err on the side of caution." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.), *cert. denied*, 498 U.S. 906, *and* 498 U.S. 989, *and* 498 U.S. 990 (1990); *Arredondo v. United States*, 178 F.3d 778, 787 (6th Cir. 1999). Using this principle as a guide, we must assign equivalent values of marijuana to the admissible testimony. Dodge's testimony can be taken at face value because he attested to an amount of marijuana that was actually confiscated by the FBI agents. All the other witnesses provided figures subject to interpretation, and therefore the results must be cautiously analyzed. The district court comfortably could have determined that Rush purchased three nickel bags containing one gram of marijuana each, seven times a week, for a nine-month (or thirty-nine week) period, which yields 819 grams of marijuana (.819 kilograms).[21] Applying a formula for the larger quantities purchased by Rush, the district court could have estimated conservatively that he bought one half of a pound, every two weeks, during the nine-month period (approximately twenty weeks). This equation would yield 10

---

[21]3 grams x 7 days x 39 weeks (nine months) = 819 grams (.819 kilograms).

pounds, which converts to 4.535970 kilograms.[22] With respect to Easterling's testimony, a conservative calculation could find that she bagged 300 nickel bags at one gram of marijuana each, three times a week, from September 1997 through April 1998 (the end-date of the conspiracy as specified in the indictment). This equation would yield 31.5 kilograms of bagged marijuana.[23] Finally, analyzing Smith's testimony conservatively and in keeping with the Probation Department's formula, we conclude that if fifty-eight customers bought nickel bags containing one gram of marijuana five days per week[24] for the two years of the conspiracy (104 weeks), the amount of marijuana sold would total 30.16 kilograms.

Although if we added all of these figures together we would surpass the fifty kilograms needed, using the rule of *Walton*, Darwich's argument against double-counting has particular relevance. Darwich argues on appeal that in order to reach the fifty kilograms beyond a reasonable doubt, the sentencing court must refrain from considering evidence of bagged marijuana in conjunction with evidence of purchased marijuana. Darwich contends that if the court adds all of these figures to reach a drug quantity, the final drug count would be inflated because the marijuana bagged for sale is the same marijuana that was purchased at the market. We agree with this position and determine that in order to reach the necessary fifty kilograms beyond a reasonable doubt the

---

[22]One kilogram equals 2.2046 pounds.

[23]300 grams x 3 days x 35 weeks = 31,500 grams (31.5 kilograms).

[24]While it is true that during the six months that Canfield Market was under surveillance the market generally was open seven days a week, Smith's testimony revealed that the store was closed for extended periods of time when Darwich was on vacation, when the store was robbed, and twice when Darwich was in the hospital, once recovering from a gun-shot wound and once after a suicide attempt. All tolled, Smith accounted for at least four weeks from 1997 to 1998 when the market was closed.

amount of marijuana sold must be considered separately from the amount bagged for sale. The proffered evidence shows that the total amount in bagged marijuana was just over thirty kilograms, nearly twenty kilograms shy of the fifty-kilogram mark. The evidence of sales established that Darwich sold just over thirty-six kilograms of marijuana from the Canfield Market. Thus, neither of these figures is sufficient to establish fifty kilograms beyond a reasonable doubt.

The dissent makes three critical errors to reach its conclusion that drug quantity was established beyond a reasonable doubt. First, it relies solely on Rush's hearsay testimony to establish the drug quantity beyond a reasonable doubt by finding that it falls within the "statement by a co-conspirator" exemption from the hearsay rule. Second, it fails to address the inadmissibility of Dodge's hearsay testimony regarding the grand jury testimony. And third, it neglects the long-standing principle that a sentencing court is instructed to "err[] on the side of caution when calculating drug quantities." *Arredondo*, 178 F.3d at 787. The dissent also hypothesizes that it is feasible to reach the necessary fifty kilograms through Smith's testimony alone by deriving a formula from his testimony regarding the average number of drug buys during his shift at the Canfield market. In a footnote, the dissent applies this formula of purchases per hour to the hours the Canfield market conducted business, assuming that sales took place at a constant rate throughout the day. Although the dissent mentions this evidence as an aside, it is, nonetheless, surprising that the dissent would even tentatively indicate that such an extrapolation would provide evidence of drug quantity beyond a reasonable doubt. As stated above, Smith's testimony only yields 30.16 kilograms of marijuana.[25] The dissent's approach makes broad

---

[25]Even ignoring our duty to "err on the side of caution," we still fall short of the necessary fifty kilograms when we use the number of customers and amount of marijuana consistent with the higher ranges provided by Smith's testimony, i.e., assuming sixty-three customers

unfounded assumptions to conclude that Smith's testimony alone would suffice.

In conclusion, the district court's acceptance of hearsay testimony to reach the necessary fifty kilograms beyond a reasonable doubt was erroneous. Without establishing that Darwich was responsible for at least fifty kilograms of marijuana beyond a reasonable doubt, the court cannot sentence Darwich under § 841(b)(1)(C), and instead must sentence him under § 841(b)(1)(D) which establishes a sixty-month maximum for quantities of marijuana under fifty kilograms. 21 U.S.C. § 841(b)(1)(D). Therefore, Darwich's sentence of eighty-eight months is improper because it subjects him to a sentence in excess of the statutory maximum in violation of his constitutional right to have each element of the offense proved beyond a reasonable doubt.

## B. Sufficiency of the Evidence at Sentencing

Darwich, in a series of fact-based objections, challenges the district court's finding by a preponderance of the evidence that he is responsible for 236 kilograms of marijuana over the length of the conspiracy.[26] Specifically, Darwich argues that the district court erred by double-counting the amount of marijuana to reach the necessary drug figures, by failing to account for interruptions in drug activity, and by relying on

---

purchased nickel bags containing 1.5 grams of marijuana five days per week for the two years of the conspiracy establishes only 49.14 kilograms of marijuana.

[26]Even though we already have determined that Darwich's sentence is in conflict with *Apprendi*, we still need to address Darwich's sufficiency of the evidence challenges to his base offense level because on remand Darwich's total offense level can impact his ultimate sentence provided that the total offense level permits the district court to sentence him to less than the sixty-month maximum. The sentencing guidelines require that Darwich must be involved with at least 100 kilograms by a preponderance of the evidence before Darwich can receive the base offense level 26 that he was assigned at sentencing.

Rush's purportedly incredible testimony. Although we addressed some of Darwich's arguments in our *Apprendi* discussion, we now will address them in the context of whether the district court could properly assign Darwich a base offense level of 26, which requires finding by a preponderance of the evidence involvement with more than 100 and less than 400 kilograms of marijuana.

We review for clear error the district court's factual findings on drug quantity attributable to a defendant for sentencing purposes. *United States v. Mahaffey*, 53 F.3d 128, 131 (6th Cir. 1995); *United States v. Walton*, 908 F.2d 1289, 1300-01 (6th Cir.), *cert. denied*, 498 U.S. 989 (1990). "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir. 1997) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)), *cert. denied*, 523 U.S. 1086, *and* 523 U.S. 1101, *and* 524 U.S. 920 (1998). If the district court interprets the evidence in a manner consistent with the record, we are required to uphold its decision even if we would have reached the opposite conclusion. *Anderson*, 470 U.S. at 573-74 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

### 1. Double-Counting at Sentencing

Darwich raises a double-counting argument concerning the district court's calculations to establish drug quantity by a preponderance of the evidence, in which Darwich argues that the district court improperly combined both bagged and sold marijuana to reach an inflated quantity. Separating the evidence of bagged marijuana from the evidence of marijuana sales, we believe that it is clear that using evidence of the bagging operation alone results in an easy finding by a

preponderance of the evidence of at least 100 kilograms of marijuana.

As discussed in the preceding section, a conservative estimate from Easterling's testimony results in a finding that she bagged 31.5 kilograms of marijuana. In addition, the less stringent evidentiary standards applicable to sentencing allow the district court to consider Dodge's hearsay testimony reiterating the testimony before the grand jury. Dodge testified that Arthur Pace told the grand jury that he bagged one pound of marijuana each night during the fall of 1997. This yields yet another 41.2 kilograms.[27] Rush's testimony repeating his nephews' statements is also fair game when establishing drug quantity for sentencing by a preponderance of the evidence. Rush testified that his nephews bagged a pound each night for the length of the two-year conspiracy. Using a mere fraction of this testimony provides adequate evidence of drug quantity in excess of 100 kilograms. Thus, the district court did not clearly err in determining that Darwich's conspiracy involved at least 100 kilograms of marijuana.

### 2. Interruptions in Activity

Darwich argues that the district court's drug-quantity findings did not adequately account for periods of time when the Canfield Market was closed. The district court had determined that the probation department's aggregating formula was sufficient to account for the minor interruptions cited by Darwich.

The district court did not clearly err when it found Darwich responsible for a conspiracy involving, by a preponderance of the evidence, at least 100 kilograms of marijuana. First, the surveillance of the Canfield Market indicated that the store was open seven days a week, whereas the probation

---

[27] 1 lb. x 7 days x 13 weeks (3 months) = 91 lbs. (41.2 kilograms).

department's formula calculating drug quantity used a five-day-per-week assumption. It is not clearly erroneous for the district court to determine that the formula's use of fewer days adequately compensates for any periods in which the market was closed. Second, as stated above, the evidence of marijuana sales is not necessary for a finding that Darwich's conspiracy involved by a preponderance of the evidence more than 100 kilograms of marijuana because the evidence of bagged marijuana alone is enough to reach that mark comfortably. Thus, Darwich's argument that the Canfield Market was closed on a number of occasions has no bearing on whether the bagging operation continued uninterrupted.

### 3. Unreliable Testimony

Darwich contends that the district court should not have relied on Rush's testimony because it was procured by the government's promise to Rush of a reduced sentence. We previously have stated that "[w]e are generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001). In keeping with this principle, we find no reason to disrupt the district court's determination that Rush's testimony was credible, after the district court had a first-hand opportunity to observe him.

## C. Sentence Enhancements

### 1. Firearm Enhancement

"A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review." *Bartholomew*, 310 F.3d at 924 (quotation omitted). "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Latouf*, 132 F.3d at 331

(quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). We will uphold the district court's decision as long as it has interpreted the evidence in a manner consistent with the record. *Anderson*, 470 U.S. at 573-74. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

U.S.S.G. § 2D1.1(b)(1) orders sentencing courts to increase the defendant's sentence by two levels "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1) (2001). The sentencing court is instructed to apply the two-level enhancement when a weapon is present, "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.3. This requirement for a strict sentence enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Id.* The government bears the burden of showing by a preponderance of the evidence that the defendant either "actually or constructively possessed the weapon." *United States v. Hough*, 276 F.3d 884, 894 (6th Cir.), *cert. denied*, 535 U.S. 1089, *and* -- U.S. --, 123 S. Ct. 199 (2002). "Constructive possession of an item is the ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.), *cert. denied*, 519 U.S. 858 (1996) (citation and internal quotations omitted). Once the government meets its burden of showing that the defendant possessed a weapon, a presumption arises that "the weapon was connected to the offense." *Hough*, 276 F.3d at 894. The burden then shifts to the defendant to "show that it was 'clearly improbable' that the weapon was connected with the crime." *Id.* The district court applies the two-level enhancement if the defendant fails to meet this burden. *United States v. Miggins*, 302 F.3d 384, 391 (6th Cir.), *cert. denied*, -- U.S. --, 123 S. Ct. 712 (2002), *and* -- U.S. --, 123 S. Ct. 909, *and* -- U.S. --, 123 S. Ct. 1772 (2003).

The PSR recommended an enhancement based upon the seven firearms found pursuant to lawful searches of

Darwich's home. The district court accepted these recommendations. On appeal, Darwich contends that the weapons found in his home were not sufficiently linked to the drug activities that took place at the Canfield Market. In support of his position, Darwich cites *United States v. Peters*, 15 F.3d 540 (6th Cir. 1994), a case involving cocaine seized in plain view from the top of a dresser. However, in *Peters*, the sentencing court did not apply the firearm enhancement even though a pistol with a fully loaded magazine was found in a zippered pouch in the dresser drawer, because it determined that the pistol was not connected to the drug offense. *Id.* at 546. We upheld the district court's decision, noting our deferential posture when reviewing for clear error. *Id.*

While Darwich might be correct in his position that the government failed to demonstrate how these weapons were connected to the Canfield Market activities, the weapons surely could have been connected to the bagging operation that took place in his home. Because the weapons were found in Darwich's home where the drugs were bagged, a presumption arose that "the weapon[s were] connected to the offense." *Hough*, 276 F.3d at 894. Once this presumption takes effect, the burden was on Darwich to "show that it was 'clearly improbable' that the weapon[s were] connected with the crime." *Id.* Darwich argues that the connection of the weapons to the drugs was tenuous, but fails to show that the presumed connection was "clearly improbable." Thus, the district court did not clearly err in applying the two-level firearm enhancement.

## 2. Leadership Enhancement

U.S.S.G. § 3B1.1(a) provides that a defendant's sentence can be enhanced by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Subsection (c) provides for a two-level enhancement if the criminal activity involved less than five

participants or if it could not be considered extensive. U.S.S.G. § 3B1.1(c). We review factual findings made by the district court when determining the appropriate sentence for clear error. *United States v. Mahaffey*, 53 F.3d 128, 131 (6th Cir. 1995).

In the PSR, the probation department recommended that the district court give Darwich a four-point enhancement for his leadership role in the offense. Darwich objected to this enhancement. At sentencing, the district judge agreed with the probation department, overruled Darwich's objection, and applied the four-level enhancement. Specifically, the district court stated in response to Darwich's objections that "paragraph twenty-six speaks of a four point enhancement for adjustment in the role of the offense. And I'm denying the objections to that enhancement for the reasons stated by the United States Probation Department." J.A. at 507 (Sentencing Tr.).

On appeal, Darwich argues that the district court did not make specific factual findings on the question of leadership and instead relied on the PSR in deciding to apply the enhancement. At the time the district court held Darwich's sentencing hearing, Rule 32(c)(1) of the Federal Rules of Criminal Procedure provided that "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed. R. Crim. P. 32(c)(1) (1999). As discerned by our previous cases, the purpose of this rule was "to ensure that sentencing is based on reliable facts found by the court itself after deliberation," and thus, the district court cannot "summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *United States v. Tarwater,* 308 F.3d 494, 518 (6th Cir. 2002). This court required "literal compliance" with this rule in order to enhance the accuracy of the sentence and the clarity of the

record. *United States v. Parrott*, 148 F.3d 629, 633 (6th Cir. 1998).

On December 1, 2002, amendments to the Federal Rules of Criminal Procedure replaced Rule 32(c)(1) with Rule 32(i)(3). Rule 32(i)(3)(B) states that "for any disputed portion of the presentence report or other controverted matter" during sentencing, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3) (2003). This new rule attempts to eliminate confusion over whether courts were required to make rulings on every objection to the PSR or only those that have the potential to affect the sentence. Fed. R. Crim. P. 32(i)(3) advisory committee's note (2002). The new rule makes clear that controverted matters at sentencing only require a ruling if the disputed matter will affect the eventual sentence. Prior to these revisions, we already had interpreted the rule in a manner consistent with Rule 32(i)(3)'s recent clarification. *See, e.g.*, *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (requiring a defendant to "expressly call [controverted matters] to the court's attention" before Rule 32(c)(1) would apply); *Parrott*, 148 F.3d at 634 (holding that failure to follow Rule 32(c)(1) is harmless error when resolution of the controverted matter would not affect the defendant's sentence).

Because the matter of leadership role was disputed by Darwich in his objections to the PSR, the district court had an obligation under Rule 32(i)(3) to issue a ruling on the disputed matter unless the matter would not affect sentencing or would not be considered in sentencing. Here, the disputed matter — whether Darwich was an organizer or leader of this marijuana conspiracy — absolutely would affect sentencing because without the four-point enhancement provided in the guidelines, Darwich would have a total offense level of 25 which allows for a sentence of as little as fifty-seven months. The district court never issued a specific ruling on whether the criminal activity involved five or more individuals or

whether it could be considered extensive. In fact, even though Darwich objected to the PSR's role-in-the-offense enhancement, the district court neglected to address this objection in its opinion. Instead, the district court's opinion addressed solely the issue of whether 236 kilograms of marijuana could be attributed to Darwich. The district court embedded any potential reasoned explanation for its resolution of the disputed matter within its explanation of how the drug quantity was established beyond a reasonable doubt.[28] At the subsequent sentencing hearing, the district court likewise failed to issue a ruling on this disputed matter. In ordering a four-level enhancement, the district court exclusively relied on the reasoning of the probation department. However, we recently reiterated that exclusive reliance on the PSR when a matter is in dispute cannot be considered a ruling. *See generally United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003) (noting that Rule 32(i)(3)'s predecessor, Rule 32(c)(1), in conjunction with U.S.S.G. § 6A1.3, prohibits reliance on the PSR when factual matters are in dispute). Even though *Treadway* applied Rule 32(c)(1), we hold that a Rule 32(i)(3) ruling, similarly, requires more than blind reliance on the PSR.

Because the PSR cannot be substituted for a ruling on a disputed matter and because the district court did not issue a ruling on the disputed matter of whether Darwich's illegal drug activity was extensive or involved more than five

---

[28]The district court attributed 236 kilograms to Darwich noting that its "findings in this matter are based on the testimony of several witnesses, all of which demonstrate that the Defendant was a wholesaler and retailer of marijuana, selling a great deal of marijuana over a long period." J.A. at 561 (7/10/01 Dist. Ct. Op. & Or.). The court also commented that it was "impressed by the testimony which showed that Canfield Market was basically a drug operation." *Id.* at 560. The district court further commented on the length of the conspiracy and the number of small and large quantity sales. *Id.* We determine that these statements, without more, are insufficient to constitute a ruling satisfying Rule 32(i)(3) on whether the criminal activity was extensive or involved more than five people as is required for an enhancement under § 3B1.1(a).

individuals, we conclude that the district court failed to comply with Rule 32(i)(3). Accordingly, on remand the district court should issue a ruling on the disputed matter of whether Darwich deserves an enhancement for role in the offense in accordance with Rule 32(i)(3).

## III. CONCLUSION

Because the district court could not properly conclude that the evidence established fifty kilograms beyond a reasonable doubt, we **REVERSE** the district court's determination of the amount of drugs, **VACATE** Darwich's sentence based both on the insufficient drug quantity conclusion and also on the district court's failure to issue a ruling on the disputed matter of whether Darwich deserved a leadership enhancement, and **REMAND** this case to the district court with instructions to proceed in accordance with this opinion and sentence Darwich to a prison term not exceeding sixty months.

## CONCURRING IN PART, DISSENTING IN PART

KENNEDY, Circuit Judge, concurring in part and dissenting in part. Defendant raised no hearsay objection of any kind at his sentencing hearing, including no objection to Rush's testimony, and indeed stipulated to the admission of extensive grand jury testimony, all of it hearsay. He did not raise the hearsay issue before the district court on his resentencing after remand following *Apprendi*. He did not raise the issue in his appellate briefs.

The majority holds that defendant did not forfeit or waive the issue because in his Supplement to Sentencing Memorandum and Objections (to the presentence report) he raised a question as to the reliability of Rush's nephews' hearsay statements. However, he raised no objection to their admissibility. There was nothing to alert the district court to the present hearsay issue. The issue was first raised by this court at oral argument. Defendant is therefore limited to plain error review. Federal Rule of Evidence 103(d). To establish plain error, a claimant must show that there is "(1) error, (2) that is plain, . . . (3) that affects substantial rights," and (4) that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (internal quotation marks omitted); *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

The district court's reliance on Orlando Rush's testimony was not plain error because Rush's testimony was not plainly hearsay. Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Rush's nephews bagged illegal drugs for Darwich, and thus were co-conspirators. The majority agrees that Rush was a co-conspirator since he admitted to re-selling

drugs purchased from Darwich. He also aided the conspiracy by providing transportation for his nephews to Darwich's home with knowledge that they were paid to bag drugs there. Although we have no specific finding that the nephews' statements were made in furtherance of the conspiracy, it would not have been plain error for the district court to so find. A statement is made in furtherance of a conspiracy if it is intended to promote the objectives of the conspiracy. *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982). This includes statements "made to keep a conspirator abreast of a co-conspirator's activities . . . ." *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988) (citing *United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983)) (internal quotation marks omitted). Rush's nephews kept Rush, a co-conspirator, apprised of the quantity of drugs they were bagging for Darwich. We have affirmed a district court's ruling in a similar instance in an unpublished decision, *United States v. Brooks*, 41 Fed. Appx. 718, 723 (6th Cir. 2002). In *Brooks*, the district court admitted the statements of a co-conspirator that he and the defendant had "gone to Knoxville to cook some methamphetamine." *Id*. We held that, because such statements could be interpreted as keeping the listener abreast of the activities of the conspirators, they were admissible under Rule 801(d)(2)(E). *Id*. Based on this case law, it would not have been plain error to hold that Rush's statements were admissible non-hearsay.

Orlando Rush's testimony about his nephews' statements is alone sufficient to affirm both the 50 kilograms beyond a reasonable doubt and 100 kilograms by a preponderance of the evidence. Rush testified that his nephews told him they bagged one pound per day from "some time" in 1996 until he surrendered in 1998 – dates roughly consistent with the 104 week span within the conspiracy. He testified he knew that the nephews worked about every night since he dropped them off about every day. Based on the five-day-per-week

assumption, this evidence alone supports a finding of 236 kilograms of marijuana.[1]

Because this evidence is more than sufficient to insulate the district court's quantity calculation from possible *Apprendi* error, I would not need to reach the question of whether reliance on Agent Dodge's testimony about the conspiracy and transcripts of the grand jury proceedings would have been plain error. Any hypothetical error is harmless. However, I cannot see how accepting a stipulation to grand jury testimony can be plain error or even error under the circumstances here.

Defendant cannot establish that his rights are substantially affected or the fairness of the proceedings significantly affected by any error here, even if one found it did occur. After the remand, the defendant and the government sought to have the district court accept a joint stipulation that the government would be able to prove that defendant trafficked between 80 and 100 kilograms of marijuana.

While the district judge rejected the stipulation, holding that it was his responsibility under the sentencing guidelines to determine the amount, and instead conducted the evidentiary hearing,[2] that defendant was willing to stipulate to that amount is persuasive that neither his rights nor the

---

[1]Had the defendant objected to Rush's hearsay testimony or not stipulated to Agent Dodge's testimony or the grand jury transcripts, there is at least some indication in the record that one of the nephews could have been called as a witness. (J.A. 129)

[2]The stipulation would have capped the sentence under the cap in the plea agreement.

fairness and integrity of the proceeding are substantially affected by a finding of 50 kilograms.[3]

For the foregoing reasons, I dissent from this portion of the court's decision.

---

[3]Further, based on Tom Smith's testimony, up to 79 kilograms can be attributed to Darwich based on nickel bag sales alone. Smith testified that 90 percent of Canfield Market's customers purchased nickel bags. His testimony established that between 65 and 70 customers came to the market during his shift, which was from 5:00 p.m. to 9:00 p.m., closing time. He further testified that the market typically opened at 11:00 a.m. Assuming a relatively constant rate of patronage throughout the day, the Canfield Market had approximately16 customers per hour, and 160 customers per day. If 90 percent of its 160 customers per day bought one-gram nickel bags five days per week, then over the course of the conspiracy Darwich sold 79 kilograms in nickel bags alone.