**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0079n.06
No. 17-1210

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 15, 2018
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,                    )
                                             )
    **Plaintiff-Appellee,**                   )        ON APPEAL FROM THE
                                             )        UNITED STATES DISTRICT
v.                                           )        COURT FOR THE EASTERN
                                             )        DISTRICT OF MICHIGAN
BERNARDO SANTANA,                            )
                                             )
    **Defendant-Appellant.**                  )        OPINION
                                             )
                                             )

Before: MOORE, COOK, and McKEAGUE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** This case arises from a dispute at sentencing regarding the size of Defendant-Appellant Bernardo Santana's role in a heroin-trafficking conspiracy. Santana, who had pleaded guilty and admitted to helping traffic between one and three kilograms of heroin, claimed that he was a first-time offender and little-used middleman who ought to be dealt with leniently; the Government, citing the grand-jury testimony of two cooperating defendants, disagreed. Santana now challenges the district court's reliance on those two cooperators' statements in overruling Santana's objections and sentencing him to 180 months' imprisonment. Reviewing the district court's conclusions deferentially, as we must on a challenge like this one, we **AFFIRM** Santana's sentence.

## I. BACKGROUND

Bernardo Santana was born in the Dominican Republic in 1965 and became a naturalized U.S. citizen in 1997, living in and around Detroit. Presentence Investigation Report ("PSR") at 8–9.[1] He reports having returned to the Dominican Republic to reside in 2006, *id.* at 9, and there is no evidence to the contrary. Prior to his involvement in this case, Santana had no criminal record. *Id.* at 8.

On June 28, 2006, members of the U.S. Drug Enforcement Agency ("DEA") arrested a Detroit-area drug distributor. CD-1 Grand Jury Testimony at 23. (The parties have dubbed this distributor "CD-1" to protect his identity, and we accordingly do as well.) After electing to cooperate with the Government's investigation, CD-1 revealed, among other relevant details, information that led to the arrest of a second Detroit-area drug distributor ("CD-2"). DEA agents arrested CD-2 on June 24, 2008, discovering approximately two kilograms of heroin and over a million dollars in cash at his residence. CD-2 Grand Jury Testimony at 5. CD-2 also agreed to cooperate with the Government.

On October 22, 2008, CD-2 testified to a grand jury about a heroin-importation operation of which he had been a customer. CD-2 Grand Jury Testimony at 2. He described a scheme whereby a courier would deliver between a half-kilogram and four kilograms of heroin, usually (though not strictly) once per month, and generally calling a day or two before to signal the

---

[1]Like several other documents at issue in this case, Santana's PSR was sealed and lacks both a public docket number and sequential page-identification numbers. Where such information is lacking, this opinion cites only the relevant page numbers within the sealed documents themselves.

impending delivery. *Id.* at 9–10; *see also id.* at 39 (explaining that lapses between deliveries could go "two months, three months," or even "six months"). CD-2 stated that the heroin was often concealed in shoes, *id.* at 17, though at times it was concealed beneath clothes, *id.* at 26. CD-2 also explained that a regular courier (also named Bernardo, it turns out, *see id.* at 28–29) was at times accompanied by another person who acted as an interpreter, *id.* at 21–22, and that two other people also at times came to deliver heroin or collect money, *id.* at 28–29.

Importantly for this case, CD-2 identified one of the people who occasionally collected money as "the main guy's wife," and CD-2 in turn identified "the main guy" as Bernardo Santana. *Id.* at 29, 31; *see also id.* at 33–34. CD-2 reported meeting Santana through "an acquaintance . . . named Terrance Chambers" in 1998 or 1999 and described Santana as "the boss of" the various couriers. *Id.* at 31; *see also id.* at 34. CD-2 said that he had met Santana in Detroit, but explained that Santana was Dominican and had moved back to the Dominican Republic, choosing to oversee the trafficking operation from there. *Id.* at 31–34. CD-2 further testified that he had initially received "small amounts" of heroin from Santana, *id.* at 37, which he had tested in the market before deciding to become a regular buyer, *id.* at 38. All in all, CD-2 estimated, he had received more than 100 kilograms of heroin from Santana's organization over the past decade. *Id.* He guessed that Santana's wife had come to collect money from him "[i]n excess of fifty times." *Id.* at 39.

In early 2009, using a wiretap, DEA agents learned that Santana had been in cell-phone contact from the Dominican Republic with two other heroin buyers identified by CD-1 and CD-2: Dwayne Toland and Burton Norfleet. PSR at 6. Speaking with each by phone, Santana

admits, he agreed to ensure that Toland and Norfleet received between one and three kilograms of heroin.  PSR at 6; Addendum to PSR at 2; R. 38 (Def.'s Sentencing Mem. at 6–7) (Page ID #126–27); *see also* R. 39 (Gov't Sentencing Mem. at 3–5) (Page ID #220–22).  In April 2009, DEA agents seized heroin, trafficking paraphernalia, and guns from Toland's house, as well as over $133,000 that they found hidden in a vehicle that had arrived and been parked in Toland's garage the night before.  R. 39 (Gov't Sentencing Mem. at 4–5) (Page ID #221–22).

CD-1, meanwhile, testified to a grand jury on October 7, 2009.  CD-1 Grand Jury Testimony at 2.  Like CD-2, CD-1 testified to knowing Terrance Chambers, whom CD-1 also identified as having introduced him to Santana.  *Id.* at 8–9.  (CD-1 believed that the introduction had occurred in 2006, and though he did not recall "exactly what month," he remembered that "it was warm outside" at the time.  *Id.* at 9.)  Again like CD-2, CD-1 told the grand jury that Santana was from the Dominican Republic and had returned there, *id.* at 9, 37, and stated that he too had initially received "samples" from Santana, *id.* at 9–10.  He likewise reported that he "didn't see" Santana any more after one or two initial deliveries, *id.* at 15, 39, that he instead received monthly deliveries from couriers (the principal one of whom used an interpreter) who would call in advance of delivery, *id.* at 15–16, and that he would often give money to Santana's wife to pay for the heroin, *id.* at 14.  All in all, CD-1 estimated that he had received "between 25 to 30" kilograms of heroin from Santana's operation during the year or so in which he had purchased from them.  *Id.* at 23.

CD-1 further testified that he was aware that CD-2 was also a Detroit-area customer of Santana's, and that Santana would at times brush off CD-2's complaints about quality by noting

that CD-1 was "having no problem." *Id.* at 24. CD-1 stated that the heroin he received through Santana's operation was generally sewn directly into clothes, *id.* at 17–18, but he acknowledged that he had also received heroin concealed in "[t]he heel of a shoe," *id.* at 30. CD-1 reported that, after he was arrested, one of Santana's couriers had occasionally stopped by his house asking for him, but that the courier did not return after CD-1 told his grandmother to explain that he had been "locked up." *Id.* at 32.

On March 29, 2011, a grand jury indicted Santana on one count of conspiring to possess heroin with intent to distribute it and conspiring to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1),[2] 846. In August 2014, Santana was taken into custody in the Dominican Republic, and in February 2015, he was extradited to the United States. R. 38 (Def.'s Sentencing Mem. at 5) (Page ID #125). He agreed to plead guilty, *see* R. 22 (Plea Agreement) (Page ID #62–69), but disputed the Government's asserted drug quantity of more than 90 kilograms and the Government's assertion that he qualified as a manager/supervisor, contending instead that he qualified for a reduction (even below the otherwise-applicable statutory minimum) under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") §§ 2D1.1(b)(17), 5C1.2, otherwise known as the "safety valve," *see* R. 22 (Plea Agreement at 3, 10) (Page ID #64, 71).

The Government filed a sentencing memorandum reaffirming its view that Santana should be found responsible at sentencing "for at least 90 kilograms of heroin" and that he "should be categorized as a manager/supervisor under USSG § 3B1.1(b)." R. 39 (Gov't

---

[2]Violations of 21 U.S.C. § 841(a) involving "1 kilogram or more of a mixture or substance containing a detectable amount of heroin" carry a mandatory minimum of 10 years' imprisonment and a statutory maximum of life in prison. 21 U.S.C. § 841(b)(1)(A).

Sentencing Mem. at 5) (Page ID #222). It referenced in its memo, and separately provided to the district court, the transcripts of CD-1's and CD-2's grand-jury testimony. *See id.* at 3 & n.1 (Page ID #220). The Government also noted that the probation department, while agreeing with regard to drug quantity, had concluded that Santana's sentence should be even higher because he qualified, in the probation department's view, as an "organizer/leader." *Id.* at 5 (Page ID #222). The Government accordingly calculated Santana's sentencing range as 235–293 months of imprisonment, while noting that the probation department had scored the range as 262–327 months of imprisonment.

Santana filed a sentencing memorandum disputing these allegations and calculations, R. 38 (Def.'s Sentencing Mem. at 1) (Page ID #121), and maintained his objections to any culpability beyond serving as a middleman for Burton and Norfleet for between one and three kilograms of heroin, Addendum to PSR at 1–7. In his sentencing memorandum, Santana argued that he "always worked at low paying jobs, never had any substantial property and assets," and "during the time period of the conspiracy, lost his house, car, and family because he had no money." R. 38 (Def.'s Sentencing Mem. at 4–5) (Page ID #124–25). Santana further stated that if the Government were to "follow the money here and in the Dominican Republic," it would find that "in addition to losing his house and car, once in the Dominican Republic, Mr. Santana lived in a small rented dwelling, had no car, [and] worked for his family's oil company at minimum wages." *Id.* at 5 (Page ID #125). Instead, he argued, the only evidence the Government had was "the co-defendants' version given in order to save themselves." *Id.* In support of his objections, along with fourteen letters on his behalf, Santana attached

6

documentation of the loss of his house and car, as well as documentation that backed up his assertions regarding his employment and residence in the Dominican Republic. *Id.* at 11–18, 90–95 (Page ID #131–38, 210–15). Santana thus argued that "his role in the conspiracy . . . to act as a middleman on behalf of Mr. Norfleet and Mr. Toland" was "consistent with all of the physical evidence and the financial lifestyle of Mr. Santana." *Id.* at 6 (Page ID #126). He proposed 57–71 months of imprisonment as his proper Guidelines range and requested credit of twenty-nine months "for time served, in addition to a substantial variance because of the International Human Rights Act violations" that he asserted he had suffered during the six months that he spent in custody in the Dominican Republic.[3] *Id.* at 1, 9 (Page ID #121, 129).

At sentencing, both Santana and the Government initially relied primarily on their sentencing memoranda, and the district court concluded that it "agree[d] with the government with respect to both the quantity and the leadership role"—determining, in other words, that Santana was responsible for a drug quantity of more than 90 kilograms and that he qualified for a three-level enhancement as a manager/supervisor.[4] R. 48 (Sentencing Tr. at 5) (Page ID #370); *see also id.* at 4 (Page ID 369).

---

[3]Santana had earlier in his memorandum described to the district court having been "forced to sleep on the concrete floor" near a "hole in the ground for bathroom purposes" alongside four other "men in a three person cell," with "no air conditioning even though the temperature in the facility would get very hot" and "lead paint falling from the walls" during these six months of custody in the Dominican Republic. R. 38 (Def.'s Sentencing Mem. at 5–6) (Page ID #125–26). Santana does not discuss that issue on appeal, however, and therefore we do not address it further.

[4]Technically, the Government used the phrase "manager/organizer," R. 48 (Sentencing Tr. at 5) (Page ID #370), which appears to meld "manager/supervisor" (a three-level increase) with "organizer/leader" (a four-level increase), *see* U.S.S.G. § 3B1.1(a)–(b). In full context,

Santana's lawyer then asked to be heard and, with the district court's permission, reiterated Santana's arguments against the heightened drug quantity and the manager/supervisor enhancement, *id.* at 6–7 (Page ID #371–72), pointing both to the "tremendous benefits" that the two cooperating defendants had received for implicating an ostensible "kingpin" like Santana and to Santana's financial woes, employment situation, and lifestyle during the relevant time period, *id.* at 8 (Page ID #373). "If he, in fact, was supposed to be the kingpin of a conspiracy that took place involving over 100 kilos of heroin and getting hundreds of thousands, maybe millions of dollars crossing his hands," Santana's lawyer asked, "where is that?" *Id.* at 8–9 (Page ID #373–74). "When he was arrested, he was living in an apartment that probably cost three, $400 a month, working menial jobs for the gas and oil company that was down in the Dominican Republic," Santana's attorney continued. "Again, people don't live like that if they're kingpins involving millions of dollars." *Id.* at 10 (Page ID #375).

The district court then asked to hear from the Government, which likened Santana's "claim that this only involved between 1 and 3 kilograms of heroin" to "defendants who claim that they just happen to be the unluckiest person in the world to commit the crime only when investigators are looking." *Id.* at 13 (Page ID #378). The Government further clarified, however, that "this was not a financial-based investigation," and that, because "Santana was in the Dominican Republic," there was "less information than" would have been available "had Mr.

however, given the existing disagreement between the Government and the probation department and the applicable enhancements, the Government's statement "that Mr. Santana is accurately classified as a, at least a manager/organizer, which is a three-point bump, which the government scored him in the plea agreement," makes clear that the Government meant "manager/supervisor." *See* R. 48 (Sentencing Tr. at 5) (Page ID #370).

Santana been living in the Detroit metropolitan area during the right period." *Id.* at 15 (Page ID #380). The Government added that "even if it is true that Mr. Santana was not making a lot of money, the fact that he was perhaps a bad businessman doesn't take away from the seriousness of the crime," *id.* at 16 (Page ID #381), given the dangers of heroin and the evidence provided by the cooperating defendants, *id.* at 16–17 (Page ID #381–82).

> In pronouncing its sentence, the district court observed:

> This case is a little puzzling only in that it's hard to understand why Mr. Santana was living in the conditions that he was if he was this big drug kingpin, but the evidence that he was, in fact, the leader, organizer, et cetera, is very substantial. Whenever we have cooperating witnesses, they have something to gain by it, but here everyone seems to agree that Mr. Santana was the boss, and that the amounts were far greater than the 1 to 3 kilos that he insists upon.

*Id.* at 19 (Page ID #384). The court ultimately decided to "vary downward slightly," *id.* at 20 (Page ID #385), imposing a sentence of 180 months' imprisonment plus five years of supervised release, *id.* at 21 (Page ID #386). Santana now appeals his sentence.

## II. DISCUSSION

Santana argues that the cooperating defendants' statements regarding his role in the heroin-trafficking conspiracy were insufficiently reliable, and thus that his due-process rights were violated when the district court imposed a sentence in reliance on those statements. For the reasons that follow, giving required deference to the district court, we disagree and instead **AFFIRM** Santana's sentence.

## A. Standards of Review

Trial judges have "wide discretion . . . in considering the evidence submitted at sentencing." *United States v. Silverman*, 976 F.2d 1502, 1508 (6th Cir. 1992) (en banc). When finding facts relevant to sentencing determinations, they need use only a preponderance-of-the-evidence standard. *See, e.g.*, *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006). They are not bound to rules of evidence in such proceedings, and thus hearsay is permissible. *See, e.g.*, *United States v. Darwich*, 337 F.3d 645, 656 (6th Cir. 2003). Moreover, they may consider hearsay "without any confrontation requirement." *Silverman*, 976 F.2d at 1511. But even so, we have made clear, "due process requires that *some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing." *Id.* at 1504 (quoting *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989)).[5]

We have also provided some guidance on how much evidentiary basis due process requires. "As a matter of due process," we have explained, "factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation." *Id.* (citation and punctuation omitted). Similarly, "hearsay is permissible at a sentencing hearing so long as it has some minimum indicia of reliability." *Darwich*, 337 F.3d at 656. We have called this minimum-indicia (or "sufficient indicia") standard "a relatively low

---

[5]The Guidelines, it bears noting, impose this limit themselves. *See* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). "In *Silverman*," however, we "concluded that this standard was also required as a matter of due process." *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007).

hurdle." *United States v. Greene,* 71 F.3d 232, 235 (6th Cir. 1995). But the question of how we review a district court's application of this standard for purposes of finding facts at sentencing presents—as the parties' divergent treatment of the issue reveals, *compare* Appellant's Br. at 13–14, *with* Appellee's Br. at 7—a small knot to untangle. In other words, what kind of review do we apply to a sentencing court's (at least implicit) determination that there *were* sufficient indicia of reliability to meet the mandates of due process?

To begin, it is worth taking account of some nearby signposts. It is well established that we "review[] the district court's application of the [U.S.S.G.] de novo and the district court's findings of fact at sentencing for clear error." *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003). Accordingly, the quantity of drugs attributable to a defendant at sentencing is, as a factual question, reviewed for clear error. *See, e.g.*, *United States v. Young*, 553 F.3d 1035, 1051 (6th Cir. 2009). Our review of a district court's imposition of a leadership-role sentencing enhancement under U.S.S.G. § 3B1.1, meanwhile, is simply "deferential," given the "factual nuances" involved in the question. *United States v. Washington,* 715 F.3d 975, 982–83 (6th Cir. 2013).[6] And "[a] due process claim raising a mixed question of law and fact is reviewed *de novo*." *United States v. Sanders*, 452 F.3d 572, 576 (6th Cir. 2006).

At the same time, turning to the central question here, we have not been entirely consistent or precise when it comes to the standard for evaluating challenges to the reliability of

---

[6]We have, it bears noting here, found the qualifications for an "organizer" enhancement satisfied where a defendant admitted "that he set up a cocaine transaction," *United States v. Williams*, 894 F.2d 208, 214 (6th Cir. 1990), and we have likewise upheld such an enhancement where it appeared possible that "someone else was also a leader of [a] conspiracy" on the grounds that "more than one person can be an organizer or leader," *Washington*, 715 F.3d at 984.

statements introduced at sentencing, which in turn support some of the factual determinations just discussed. At times, we have characterized the sufficient-indicia test as a freestanding inquiry sufficient to pass clear-error review, such that a reviewing court need merely ask whether the sufficient-indicia test was met to determine whether there was any clear error. *See United States v. Reid*, 357 F.3d 574, 582 (6th Cir. 2004); *United States v. Gessa*, 57 F.3d 493, 496 (6th Cir. 1995). At other times, we have instead stated the question as whether a district court clearly erred in determining that the minimum-indicia test was met. *See United States v. Melesio*, 532 F. App'x 596, 599 (6th Cir. 2013); *United States v. Manis*, 344 F. App'x 160, 164 (6th Cir. 2009); *United States v. Hunt*, 487 F.3d 347, 350, 353 (6th Cir. 2007). Still other times, we have stated the question as whether a district court abused its discretion in judging statements reliable. *See United States v. Bates*, 315 F. App'x 591, 594 (6th Cir. 2009); *United States v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007). And we have added that "[t]o the extent that [a] Defendant's claims sound in due process, we review them *de novo*." *Moncivais*, 492 F.3d at 658. In light of this thicket of standards, it is understandable that the parties themselves either elide or disagree on the relevant standard to apply here.

To clarify: when facing a due-process challenge (like Santana's) to a district court's reliance on statements for the purposes of finding facts at sentencing, we review the district court's reliance on such statements—that is, its conclusion that those statements had sufficient

indicia of reliability—for clear error.[7]  This standard accords with our circuit's rule for stare decisis, *see Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), as clear-error review appears to have been the standard used in the earliest published case on point after our circuit clarified en banc the broader doctrine encompassing this question in *Silverman*. *See United States v. Gibson*, 985 F.2d 860, 864 (6th Cir. 1993) (observing, in the context of defendant's challenge to sentencing court's reliance on inculpatory statements incorporated into PSR, that "we review the district court's factual determination concerning the reliability of witness testimony under the clearly erroneous standard").  It also avoids the potential incongruity of applying clear-error review to an obviously factual question like the quantity of drugs attributable to a defendant while applying some other standard to statements that entirely undergird, as here, that determination.[8]  And it recognizes the deference we accord trial judges on such fact-bound issues, *see, e.g.*, *Silverman*, 976 F.2d at 1508–09, in close harmony with our recent cases applying an abuse-of-discretion standard.[9]

---

[7]Of course, what due process more generally requires—for example, whether a given practice or procedure violates due process—remains a legal question that receives de novo review.  But that is not the type of claim that Santana presses here.

[8]Perhaps seeking to avoid such incongruity, the Government here construes Santana's challenge as targeting the district court's calculation of the quantity of drugs attributable.  *See, e.g.*, Appellee's Br. at 6–7.  But while the two questions ultimately converge here, it is nevertheless worth formally noting that Santana does not characterize his argument that way.  Instead, he argues that "his due process rights were violated when the sentencing judge adopted the government's relevant conduct argument" by relying on "unreliable hearsay from cooperating sources which the government was unable to corroborate."  Appellant's Br. at 12.  We accordingly focus our analysis on that framing.

[9]Indeed, the conceptual gap between abuse of discretion and clear error can appear vanishingly small.  *Compare, e.g.*, *Penney v. United States*, 870 F.3d 459, 461 (6th Cir. 2017)

With that established, we note that a finding is clearly erroneous if it leaves us "with the definite and firm conviction that a mistake has been committed." *Darwich*, 337 F.3d at 663 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). On the other hand, "[i]f the district court interprets the evidence in a manner consistent with the record, we are required to uphold its decision even if we would have reached the opposite conclusion." *Id.*

## B. Santana's Sentence

In light of the foregoing, Santana's challenge hinges on whether the district court clearly erred in deeming CD-1's and CD-2's grand-jury testimony sufficiently reliable to support the district court's factual findings. *See, e.g.*, *Hunt*, 487 F.3d at 353; Appellant's Br. at 12, 17–25. We conclude that the district court did not clearly err, and thus affirm Santana's sentence.

At the outset, we note briefly two arguments that the Government advances to try to avoid or change this question altogether: First, it argues that "the district court was permitted to rely on the PSR because Santana offered nothing other than bare denials." Appellee's Br. at 7. Second, it argues that the standard of review should be plain error, because "Santana . . . never raised a due process claim below." Appellee's Br. at 12. Neither argument is compelling.

---

("An abuse of discretion occurs when a district court commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact. We will only find an abuse of discretion when our review leaves us with a definite and firm conviction that the trial court committed a clear error of judgment." (citations and quotation marks omitted)), *with Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) ("[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (citation omitted)).

First, while the Government is right that "[w]hen a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant," *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007), that is not what happened here. Though Santana did not produce a smoking gun to vitiate the cooperating witnesses' testimony altogether, he pointed to facts to call into question the veracity of those accounts: the cooperating witnesses' motives to lie, as well as the incongruity between implicating Santana as a kingpin and Santana's evidently pauperized financial situation, employment, and lifestyle. *See* R. 38 (Def.'s Sentencing Mem. at 4–6, 11–18, 90–95) (Page ID #124–26, 131–38, 210–15); *see also* R. 48 (Sentencing Tr. at 6–10) (Page ID #371–75). Moreover, it is foundationally the Government's burden, where contested, to "establish[] the [relevant] enhancement factors by a preponderance of the evidence," *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir. 1991), and we have many times before treated a defendant's challenge to the reliability of statements used against him at sentencing as being sufficient to preserve that question for more than plain-error review, *see, e.g.*, *Bates*, 315 F. App'x at 594 (reviewing reliability of hearsay statements introduced through law-enforcement testimony); *Hunt*, 487 F.3d at 352 (reviewing reliability of co-defendants' hearsay statements introduced through law-enforcement testimony); *Moncivais*, 492 F.3d at 658 (reviewing reliability of proffer statements challenged for lack of reliability). Because Santana challenged the reliability of the statements set forth against him, we review the district court's conclusion that those statements were in fact reliable.

Second, plain-error review does not apply here. Although "failure to raise a constitutional challenge before the district court" does, as the Government notes, "result[] in plain error review," *United States v. Doxey*, 833 F.3d 692, 709 (6th Cir. 2016), we have not required defendants to "utter the words 'due process'" to preserve such challenges to their sentences. *See Darwich*, 337 F.3d at 656 (quoting *United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001)). Rather, where a defendant clearly challenges a judge's fact-finding at sentencing, a due-process challenge is sufficiently preserved. *See id.* Here, as in *Darwich*, Santana "consistently objected, both in writing and orally, to the PSR's computation of a specific drug amount," *id.*, challenging the reliability of CD-1's and CD-2's testimony in both his sentencing memorandum and at the sentencing hearing. *See* R. 38 (Def.'s Sentencing Mem. at 4–6) (Page ID #124–26); R. 48 (Sentencing Tr. at 6–10) (Page ID #371–75). Plain-error review is not applicable.

Nevertheless, given our still-deferential standard of review, the Government has the better side of this case on the merits. Santana argues that the district court's reliance on "two large scale drug dealers trying to curry favor with the government" was impermissible given their motives to lie and the lack of "a scintilla of corroboration" to support their stories. *See* Appellant's Br. at 23. But as the Government points out, *see* Appellee's Br. at 9–11, Santana overlooks the fact that these two witnesses' stories corroborated *each other*. Statements by different cooperating witnesses are sufficiently reliable, we have explained, when "given independently" and some relatively lengthy amount of time apart, when they both "corroborate each other" in at least some relevant details, and when those statements also match corroborative

circumstantial evidence that can be gleaned from the defendant's personal conduct. *See Hunt*, 487 F.3d at 353 (finding sufficient indicia of reliability where statements by cooperating witnesses were given "months apart," both "includ[ed] such details as the fact that one kilogram of cocaine supplied by [the defendant] was returned because it was of poor quality," and both matched already-established conduct by the defendant); *see also Moncivais*, 492 F.3d at 659 (deeming a co-defendant's hearsay statement sufficiently reliable based in part on its having been "richly detailed" and "both internally and externally consistent").

Here, the grand-jury testimony of CD-1 and CD-2 meet these demands. The two sets of statements, given under oath and under penalty of perjury, occurred nearly a year apart. CD-1 Grand Jury Testimony at 2; CD-2 Grand Jury Testimony at 2. The two cooperating witnesses told very similar stories about Santana's role in the trafficking operation, including with regard to such details as Santana's nationality and residences, the use of shoes, the timing of deliveries, the provision of samples, Santana's wife's role in the operation, the introduction from Terrance Chambers, and Santana's main courier (including that courier's use of an interpreter). *Compare* CD-1 Grand Jury Testimony at 8–10, 14–16, 24, 30, 37, *with* CD-2 Grand Jury Testimony at 14–17, 21–22, 24, 29, 31–34, 37–38.[10] And their two accounts fit closely with Santana's preexisting

---

[10]Santana does point to one potential inconsistency that is worth discussing briefly: he cites a DEA report that ascribes to CD-1 the claim that CD-1 met with Santana in Michigan in March 2007 and that Santana came to CD-1's home after CD-1's 2007 arrest—a timeline that is inconsistent with Santana's "uncontested" assertion that he returned to the Dominican Republic in 2006. Appellant's Br. at 7 & n.3; *see also id.* at 21–22. But there are a few reasons that Santana's argument fails. First, "[i]n general, the appellate court should have before it the record and facts considered by the District Court," *United States v. Barrow*, 118 F.3d 482, 487 (6th Cir. 1997), and therefore our common practice in a challenge like this one is to "review[] the

admission that he arranged the sale of between one and three kilograms of heroin—an unlikely amount for a one-off transaction. *Cf. Manis*, 344 F. App'x at 166 ("In this case, Manis completely ignores the corroborative force of his own statements . . . ."). In light of all that, we cannot say that the district court clearly erred in treating CD-1's and CD-2's statements as sufficiently reliable.

Nor do CD-1's and CD-2's potential motives to lie render their testimony insufficiently reliable. Santana cites *Lee v. Illinois*, 476 U.S. 530 (1986), for example, for "the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable," *id.* at 546, but we have turned aside that exact argument and citation before, *see Moncivais*, 492 F.3d

---

evidence properly before the district court at sentencing," *see, e.g.*, *United States v. Currier*, 473 F. App'x 469, 473 (6th Cir. 2012). Because it does not appear that the DEA report in question was before the district court as evidence at sentencing, we should hesitate before finding clear error based on information that the district court could not have even taken into account. But even acknowledging that we might take judicial notice of evidence showing a clear inaccuracy or miscarriage of justice, *cf. Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012–13 (6th Cir. 2003) (discussing supplementation of the record under a court's equitable powers), this is not such a case. Rather, the probative value of Santana's asserted inaccuracy is quite small. There is good reason to believe, for example, that the notes in the DEA report reflect a misperception of what CD-1 said: there were "two Bernardo[]s" allegedly involved in this trafficking operation, CD-2 Grand Jury Testimony at 29, and CD-1's testimony to the grand jury indicates that CD-1 rarely saw Santana after an initial meeting in 2006 while suggesting instead that it was the *other* Bernardo (the courier) whom CD-1 saw regularly at his home and who came by CD-1's house after CD-1 was arrested. *See* CD-1 Grand Jury Testimony at 9, 15, 31–32, 37. The report, in other words, may have mixed up the two Bernardos—an understandable mistake if, for example, CD-1's recounting of these particular details was imprecise. But even if we were to assume that the report accurately reflects what CD-1 told the DEA, that hardly renders CD-1's testimony unreliable. Though the Government never contradicted Santana's assertion that he had moved back to the Dominican Republic, we do not see why Santana's post-2006 residence in the Dominican Republic precludes the possibility that Santana could have gotten on a plane and made a brief trip to Michigan. In short, this purported inconsistency—if even a genuine inconsistency it is—does not change the result of this case.

at 659. Rather, as we explained there, "co-conspirators' hearsay statements are admissible at sentencing, notwithstanding the fact that such statements may be 'suspect' on account of the co-conspirators' 'explicit or implicit desire to secure favorable treatment from the police.'" *Id.* (quoting *Hunt,* 487 F.3d at 352–53). Such statements, while potentially self-serving, are not, we have made clear, "inherently unreliable" or "presumptively inadmissible at sentencing." *Id.* at 660.

None of this means that our precedents give district courts a blank check to accept whatever they hear at sentencing. They must still, for example, view co-conspirators' statements with "special suspicion," *Hunt*, 487 F.3d at 352 (citation omitted), and they must still assure themselves of sufficient corroborative evidence, *see, e.g.*, *United States v. Gibbs*, 182 F.3d 408, 441–42 (6th Cir. 1999). But this is not a case where, for example, the district court had nothing to go on but the probation department's conclusory statements, *see United States v. Lowenstein*, 108 F.3d 80, 83–84 (6th Cir. 1997), nor a case where there has been a showing that the evidence is "extensively and materially false," *see Stewart v. Erwin*, 503 F.3d 488, 494 (6th Cir. 2007) (citation omitted), nor a case where the inculpatory statements themselves appeared potentially inconsistent or unreliable, *see Gibbs*, 182 F.3d at 441. Simply put, the statements at issue here were sufficiently reliable for the district judge to rely on them in finding facts at Santana's sentencing.

Meanwhile, though the evidence that Santana put forward regarding his financial situation, employment, and lifestyle gives us pause, as it apparently did the district judge, *see* R. 48 (Sentencing Tr. at 19) (Page ID #384), it does not leave us "with the definite and firm

conviction," *see, e.g.*, *Darwich*, 337 F.3d at 663 (citation omitted), that the district court erred in relying on the grand-jury testimony of CD-1 and CD-2. And while that evidence may belie the idea that Santana was indeed some kind of powerful "kingpin," *see* Appellee's Br. at 2, the district court's judgment was not that Santana was a *kingpin*, but rather that he was responsible for conspiring to sell more than 90 kilograms of heroin and that he had served as a manager or supervisor in that conspiracy, *see* R. 48 (Sentencing Tr. at 5) (Page ID #370). The district court did not clearly err in relying on the hearsay testimony before it to conclude as much.

### III. CONCLUSION

Santana pleaded guilty and admitted to arranging the sale of between one and three kilograms of heroin to buyers in the Detroit area, with full knowledge that two cooperating witnesses had, in testimony before a grand jury, ascribed to him a much larger role in an ongoing heroin-trafficking conspiracy. Because those cooperating witnesses' sworn statements were independently given, internally and mutually consistent, and circumstantially consistent with the large amount of heroin that Santana had already admitted to helping traffic, we hold that the district court did not clearly err in deeming them sufficiently reliable to support the court's factual findings at Santana's sentencing. We therefore **AFFIRM** Santana's sentence.